Stuart M. KAPLAN, as Trustee in Bankruptcy for Palmer Data Corporation d/b/a CompuTerminal, Plaintiff-Appellant,

v.

BURROUGHS CORPORATION, Defendant-Appellee.

No. 77–2051.

United States Court of Appeals, Ninth Circuit.

Nov. 23, 1979.

Rehearing Denied Jan. 25, 1980.

Steven J. Cannata, San Francisco, Cal., argued, for plaintiff-appellant.

Max L. Gillam, Los Angeles, Cal., for defendant-appellee.

Before HUFSTEDLER and ANDERSON, Circuit Judges, and WYATT,* Senior District Judge.

J. BLAINE ANDERSON, Circuit Judge:

Plaintiff Stuart M. Kaplan, as the Trustee in Bankruptcy for Palmer Data Corporation, doing business as CompuTerminal, appeals the decision of the court below entering judgment *non obstante veredicto* (n. o. v.) in favor of defendant Burroughs Corporation on Kaplan's action alleging a violation of Section One of the Sherman Antitrust Act, 15 U.S.C. § 1. We affirm the judgment, though on different grounds than those advanced below.

---

* The Honorable Inzer B. Wyatt, Senior United States District Judge for the Southern District of New York, sitting by designation.

## I. BACKGROUND

Plaintiff Kaplan, as Trustee in Bankruptcy, asserts the claim of Palmer Data Corporation against the defendant Burroughs Corporation for an alleged violation of Section One of the Sherman Act, prohibiting every "contract, combination . . ., or conspiracy, in restraint of trade or commerce." Suit is brought under the "treble damages" provision of the Clayton Act, 15 U.S.C. § 15.

CompuTerminal Corporation, the original entity on plaintiff's side, was organized early in 1969, and began doing business shortly thereafter as a data processing center in San Francisco. Leonard J. Palmer, a data processing specialist with several years' worth of experience in the organization and administration of data processing centers, was primarily responsible for putting the CompuTerminal operation together.

Data processing centers generally offer a variety of accounting services to both large and small businesses. Computerized data processing supplements or often replaces traditional manual bookeeping services such as payroll processing and client billing. In the early Seventies, data processing centers usually offered one of two types of processing plans. The "conventional" batch processing involved physical pick-up and transportation of client records from the client's place of business to the processing center, followed by the physical delivery of the finished work back to the client. The "remote" processing, on the other hand, called for a terminal or other transmitting device to be located at the client's place of business. The client could transmit the data directly to the center, and receive the work product back over a special printer. When Palmer originally planned CompuTerminal, he had envisioned a "remote" processing center, but decided to open a less expensive "conventional" processing service with an eye to expansion.

Defendant Burroughs Corporation, a giant in the American computer manufacturing field, took over a conventional batch processing center in San Francisco in 1969 when it purchased a data processing service owned by the Sperry-Rand Corporation. Burroughs purchased the center primarily as the result of complaints it had received from many of the center's customers that the work being processed on the Burroughs B-300 computer leased by the center was not satisfactory. Burroughs was concerned with salvaging its reputation, and was also looking to building a profitable "online" processing service for financial institutions. Burroughs apparently made no effort to expand its batch processing operation during the time that it offered the service, and concentrated mainly upon "cleaning up" the programs for existing customers.

Burroughs' lack of enthusiasm for its newly-acquired conventional processing service became even more pronounced in early 1970 when it began losing both customers and key personnel to rival processing centers, with by far the bulk of the lost business and employees going to CompuTerminal. Executives at Burroughs shortly realized that unless a sizable investment were made, or unless the conventional batch processing service were sold completely, Burroughs would continue to lose both business and employees to CompuTerminal. Accordingly, a plan was conceived to unload the conventional batch processing business before heavier losses were incurred. Known in Burroughs' executive memoranda as "Plan X," this scheme formed the basis for the antitrust claim raised in the present case.

Put simply, the object of "Plan X" was to sell Burroughs' rights under existing customer contracts to another processing center before those customers went elsewhere of their own accord. In January 1970, a number of signed batch processing contracts had been obtained from Burroughs' customers, but had not been executed by Burroughs' representatives. Despite the presence of a clause in the standard batch processing contract limiting acceptance to 30 days from offer, Burroughs executives decided to refrain from signing these contracts until a buyer for the batch processing service had been obtained. The customers apparently were not notified of the decision

not to sign the contracts. Burroughs, nonetheless, continued to provide batch processing service according to the terms of the contract.

In March 1970, Burroughs began approaching data processing centers in San Francisco with proposals to sell its processing customers. Among those centers approached was CompuTerminal. Burroughs executives apparently were impressed with the operations at CompuTerminal, and also favored selling the business to CompuTerminal because it was leasing from Burroughs a B–2500 computer system, considered at the time to be one of the better computers on the market. CompuTerminal, however, declined to accept Burroughs' offer to sell the center when Burroughs failed to produce the contracts with its clients. As Leonard Palmer put it at the time, without evidence of binding contracts Burroughs had nothing to sell.

Burroughs eventually reached an agreement with Cubit Systems Corporation in April 1970, whereby it sold both its batch processing customers and the B–300 computer system for $257,000. Pursuant to its agreement with Cubit, Burroughs embarked on a campaign to persuade its customers to consent to the transfer of business to Cubit. According to evidence presented below, Burroughs had approximately thirty customers under "contract" at the time of the transfer agreement with Cubit in April. Of these approximately thirty customers, close to half agreed to substitute Cubit for Burroughs after a single joint visit by representatives of Cubit and Burroughs. Approximately 30% required two joint visits before agreeing to the substitution. Among the remaining customers who failed to consent to substitution after two joint visits were most of Burroughs' larger customers in terms of dollar volume of business. Greater pressure was applied. Early in May, a letter was sent to each of the non-consenting customers informing them that unless they consented to the transfer to Cubit, Burroughs would consider its data processing obligations "null and void." This letter was sent to four Burroughs' customers, one of whom

moved to CompuTerminal shortly thereafter.

CompuTerminal apparently began to experience some difficulty in the marketplace around the time of the Burroughs-Cubit joint visits. A CompuTerminal salesman testified that potential customers began to exhibit a certain coldness to CompuTerminal and asked for assurances that the firm was financially stable. CompuTerminal's regular customers also began making inquiries as to solvency. According to the testimony of Palmer, CompuTerminal's financial outlook turned bleak shortly thereafter as the company encountered an increasing inability to attract new accounts.

In July 1970, CompuTerminal assigned its assets over to the newly-organized Palmer Data Corporation, essentially an alter ego of Leonard Palmer. At this point, the batch processing operation was clearly struggling. The long-term plan of converting to a remote processing service had been shelved because of CompuTerminal's inability to obtain financing for the purchase of B–5500 computer systems from Burroughs. Working capital had plummeted severely, and Palmer had repeatedly warned CompuTerminal's shareholders of the need for an infusion of around $140,000 into the business in order to stay afloat.

In March 1971, Palmer Data Corporation filed an action against Burroughs Corporation alleging violations of the antitrust laws which Palmer Data claimed had produced CompuTerminal's financial nosedive. In substance, the complaint charged that Burroughs had conspired with Cubit to restrain trade by coercing Burroughs' customers to transfer their business to Cubit, and by impliedly disparaging CompuTerminal. Cubit was not named as a defendant. In November 1971, Burroughs, with Palmer Data's lease payments on the B–2500 system thousands of dollars in arrears, filed an involuntary petition in bankruptcy against Palmer Data Corporation.

## II. *THE PROCEEDINGS BELOW*

Three separate trials have been held in this case, and the verdicts of three separate juries have been overturned.

In March 1974, following a month-long trial, a jury found in favor of the plaintiff and assessed damages against Burroughs Corporation in excess of one million dollars. The trial court ordered a new trial solely on the issue of damages.

The second trial, held in October and November of 1974, resulted in no assessment of damages against Burroughs. In February 1975, the trial court ordered a new trial *de novo* on the issues of both liability and damages. Judge Weigel, who presided at both the first and the second trial, assigned the third trial to Senior Judge Wyzanski of Massachusetts.

In January 1976, the third trial began and stretched out over a period of five and one-half weeks. The jury in the third trial found in favor of plaintiff and awarded $1,162,000 in damages. Judge Wyzanski ordered a fourth trial *de novo* in April 1976, and denied defendant's motion for a judgment *n. o. v.* After plaintiff's motion for writ of mandamus was denied by this court, plaintiff moved the district court to reinstate the earlier judgment. In February 1977, the court below entered its Findings of Fact and Opinion. In the course of that opinion, Judge Wyzanski reversed his earlier order for a new trial and entered a judgment *n. o. v.* in favor of defendant. See *Kaplan v. Burroughs Corp.,* 426 F.Supp. 1328 (N.D.Cal.1977).

On February 9, 1977, plaintiff Kaplan filed a timely Notice of Appeal.

## III. *STANDARD OF REVIEW*

On appeal from a judgment n. o. v., the appellate court must view the evidence in the light most favorable to the party against whom the motion is made. *Wescott v. Impresas Armadoras, S. A. Panama,* 564 F.2d 875 (9th Cir. 1977). The standards for granting a judgment n. o. v. and a directed verdict are the same, and neither should be granted unless the evidence permits only one reasonable conclusion as to the verdict. *Fountila v. Carter,* 571 F.2d 487 (9th Cir. 1978).

■ In order to benefit from the favorable inferences available under either the directed verdict or j. n. o. v., a party must present "substantial evidence," defined as "evidence as a reasonable mind might accept as adequate to support a conclusion." *California Computer Products v. International Business Machines,* 613 F.2d 727, 733–734 (9th Cir. 1979).

Our task on this appeal is the same as it was for the district judge. We must determine whether Kaplan has introduced "substantial evidence" under each element of a Sherman One antitrust action.

## IV. *THE RULE OF REASON*

Kaplan has introduced no evidence that Burroughs committed a *per se* violation of the antitrust laws when it sold its conventional batch processing to Cubit and actively campaigned for its customers to switch their business to Cubit. None of the well-defined categories of *per se* violations is suggested by the facts. *See United States v. Socony Vacuum Oil Co.,* 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940) (price-fixing); *United States v. Topco Associates,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972) (horizontal territorial divisions); *Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959) (group boycotts); *International Salt Co. v. United States,* 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947) (tying arrangements). Counsel for Kaplan conceded at oral argument that this case is not governed by any of the *per se* standards. Therefore, we analyze Kaplan's claim under the "rule of reason" standard.

■ The elements of a cause of action for an unreasonable restraint of trade under the rule of reason analysis of Sherman One are:

(1) An agreement among two or more persons or distinct business entities;

(2) Which is intended to harm or unreasonably restrain competition;

(3) And which actually causes injury to competition.

See generally, Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 615, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); Gough v. Rossmoor Corp., 585 F.2d 381, 389 (9th Cir. 1978), cert. denied, 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979). As this court recently stated, the primary considerations in determining whether a restraint of trade is unreasonable are whether the intent of the restraint is anticompetitive and whether the restraint itself has significant anticompetitive effects. See Sherman v. British Leyland Motors, Ltd., 601 F.2d 429 (9th Cir. 1979).

In granting the motion for judgment n. o. v., Judge Wyzanski emphasized a failure on the part of Kaplan to prove by substantial evidence either an intent to injure competition or a causational link between Burrough's activities and Palmer Data's economic downfall. While we affirm the trial court's decision, we choose to base our affirmance upon grounds other than those relied upon below. We find the lack of proof of market impact and effect upon competition to be plainly inadequate as a matter of law, and express no opinion whatever on the grounds cited below.

▮ Proof that the defendant's activities had an impact upon competition in a relevant market is an absolutely essential element of the rule of reason case. It is the impact upon competitive conditions in a definable product market which distinguishes the antitrust violation from the ordinary business tort. As the Supreme Court has noted in another context, ". . . an antitrust policy divorced from market considerations would lack any objective benchmarks." Continental T. V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 53, n. 21, 97 S.Ct. 2549, 2560 n. 21, 53 L.Ed.2d 568. Failure to produce substantial evidence proving a relevant market and an injury to competition within that market entitles a defendant in a rule of reason case to a judgment n. o. v. Gough v. Rossmoor Corp., supra, at 389. Cf. Mutual Fund Investors v. Putnam Management Co., 553 F.2d 620 (9th Cir. 1977); Knutson v. Daily Review, Inc., 548 F.2d 795 (9th Cir. 1976), cert. denied, 433 U.S. 910, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977); Twin City Sportservice, Inc. v. Charles O. Finley & Co., 512 F.2d 1264 (9th Cir. 1975); Cataphote Corporation v. DeSoto Chemical Castings, Inc., 450 F.2d 769 (9th Cir. 1971), cert. denied, 408 U.S. 929, 92 S.Ct. 2497, 33 L.Ed.2d 341 (1972); Cornwell Quality Tools Co. v. C. T. S. Company, 446 F.2d 825 (9th Cir. 1971), cert. denied, 404 U.S. 1049, 92 S.Ct. 715, 30 L.Ed.2d 740 (1972).[1]

▮ Familiar principles guide our search of the record below for evidence of proof of market definition and competitive impact. Even if sufficient proof of intent and causation are introduced, the elimination of a single competitor, standing alone, does not prove anticompetitive effect. See Gough v. Rossmoor, supra, at 386. Impact upon the market must be proven by reference to definitions of both the relevant geographic market and the relevant product market. See, e. g., Chisholm Brothers Farm Equipment Co. v. International Harvester Co., 498 F.2d 1137, 1143 (9th Cir. 1974), cert. denied, 419 U.S. 1023, 95 S.Ct. 500, 42 L.Ed.2d 298 (1974).

▮ Authorities far too numerous to cite or discuss in detail have established the guidelines to determine relevant market definition. The principle most fundamental to product market definition is "cross-elasticity of demand" for certain products or services. Commodities which are "reasonably interchangeable" for the same or similar uses normally should be included in the same product market for antitrust purposes. See generally, United States v. E. I.

---

1. Decisions in other circuits are equally adamant that market impact is an integral component of the rule of reason. See, e. g., Dougherty v. Continental Oil Co., 579 F.2d 954 (5th Cir. 1978); Columbia Metal Culvert, Inc. v. Kaiser Aluminum & Chemical Corporation, 579 F.2d 20 (3d Cir. 1978), cert. denied, 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978); H & B Equipment Co., Inc. v. International Harvester, 577 F.2d 239 (5th Cir. 1978); George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc., 508 F.2d 547 (1st Cir. 1974), cert. denied, 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673 (1975).

*Du Pont De Nemours & Co.,* 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956) (the *"Cellophane"* case). Speaking in the context of a suit brought under Section Two of the Sherman Act dealing with the offense of monopolization, this court has made the following observation: [2]

> "In defining the relevant market, the court must look beyond the particular commodity produced by an alleged monopolist because the relevant product market for determining monopoly power, or the threat of monopoly control, depends upon the availability of alternative commodities for buyers. Illegal monopoly does not exist merely because the production of a particular product is 'monopolized.' What is called for is an appraisal of the 'cross-elasticity' of demand in the trade."

*Fount-Wip, Inc. v. Reddi-Wip, Inc.,* 568 F.2d 1296, 1301 (9th Cir. 1978).

In *SmithKline Corp. v. Eli Lilly & Co.,* 575 F.2d 1056 (3d Cir. 1978), *cert. denied,* 439 U.S. 838, 99 S.Ct. 123, 58 L.Ed.2d 134 (1978), the court offered an equally succinct explanation of the market definition process:

> "In sum, defining a relevant product market is a process of describing those groups of producers which, because of the similarity of their products, have the ability—actual or potential—to take significant amounts of business away from each other. A market definition must look at all relevant sources of supply, either actual rivals or eager potential entrants to the market. A market definition must provide the numerator and the denominator in the fraction labelled 'market share.'"

*Id.* at 1063.

■ In arriving at an adequate market definition, price differential between competing products and services is a relevant factor to consider, though price differential alone does not govern the scope of the relevant market. *Twin City Sportservice,*

*Inc. v. Charles O. Finley & Co., supra,* at 1274.

■ Similar considerations govern the definition of the relevant geographic market. The concept of alternatives reasonably available to the consumer applies with equal force to the geographic as well as to the product dimension of the market definition process. The geographic market must correspond to the commercial realities of the industry and it must also be "economically significant." *Brown Shoe Co. v. United States,* 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). Thus, physical delivery limitations and significant transportation costs, among other factors, confine the geographic market for antitrust purposes.

Included within a general product or geographic market may also be several smaller submarkets which may provide the measure of the restraint of trade in a given case. The classic exposition of the submarket concept is found in *Brown Shoe Co. v. United States, supra,* wherein the Supreme Court delineated the factors to be considered in staking out the individual submarket:

> "The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors."

*Id.* at 325, 82 S.Ct. at 1524.

As this court has noted, the *Brown Shoe* indicia are not to be used in a "talismanic fashion" whereby their presence or absence are regarded as mechanically dispositive of the issue. *See International Telephone & Telegraph Corp. v. General Telephone & Electric Co.,* 518 F.2d 913, 932 (9th Cir. 1975). Rather, we must approach the problem pragmatically and keep in mind *Brown Shoe's* instruction that a submarket must be "economically significant." *Brown Shoe, supra,* 370 U.S. at 325, 82 S.Ct. 1502.

---

**2.** Generally, principles of market definition applicable to cases arising under Sherman Two are also applicable to Sherman One actions, and to merger cases arising under § 7 of the Clayton Act, 15 U.S.C. § 18.

Application of these general principles to the facts of the present case requires us to examine the evidence in the record with an eye to considerations such as the practical availability of different types of data processing services, both computerized and manual, cost barriers involved in switching from one type of service to another, and the percentage of business in that line of commerce involved in Burroughs' transfer of the conventional batch processing business to Cubit.

## V. *THE RECORD*

■ After a thorough and careful consideration of the voluminous record in this appeal, we find that plaintiff Kaplan has failed to present substantial evidence of a relevant market, and that the motion for judgment n. o. v. was, therefore, properly granted.

Both parties were given leave to file supplemental briefs on the precise issue of relevant market. Kaplan proposed a rather narrowly defined market which finds no support in the record. While there appeared to be evidence upon which the jury could have properly based a geographic market definition consisting of metropolitan San Francisco, and perhaps the area to the south, the lack of evidence pertaining to a product market compels our decision that the trial court's action was properly taken.

### A. *Kaplan's Proposed Product Market*

In its brief, Kaplan proposes that the relevant product market be defined as all batch processors located in the San Francisco area which were using Burroughs equipment at the time of Burroughs' alleged antitrust violation. According to Kaplan's interpretation of the evidence, only four batch processing centers in San Francisco used Burroughs equipment including the Burroughs center and CompuTerminal. Kaplan's breakdown of the market according to dollar volume of business is as follows:

| | | |
|---|---|---|
| Burroughs Data Center | $400,000 (20–30 customers) | 34% |
| CompuTerminal | $385,000 (15–20 customers) | 32% |
| Cubit Systems | $276,000 (17–18 customers) | 23% |
| Computer Services, Inc. | $120,000 (2 or more customers) | 11% |
| | $1,181,000 | 100% |

Burroughs contests not only the substance of Kaplan's proposed market definition, but also the accuracy of the above figures in the context of the Kaplan definition.

Kaplan does not argue that broader markets in the data processing field do not exist. He contends, rather, that Burroughs equipment users constitute a recognizable submarket under the guidelines established by *Brown Shoe, supra,* and that we should adopt that submarket as our measure of restrained competition on appeal.

The essence of Kaplan's argument is that certain technological barriers make it difficult for a client of a data processing center which uses Burroughs equipment to switch its business to a center which uses equipment manufactured by another company. The initial cost of programming equipment to handle an individual client's particular data processing needs can represent a significant investment. Preparation on one make of computer, however, cannot be transferred to a computer of another make. One cannot communicate with the other, and a program designed for one is useless for the other. Consequently, a client who has incurred the expense of initial programming for one make of computer might be deterred from changing processing centers by the prospect of a second round of programming expenses.

Kaplan also notes that when Burroughs decided to sell its batch processing business it only contacted other data centers which used Burroughs equipment. Kaplan argues that Burroughs thus recognized the difficulties in switching computer makes. Burroughs, on the other hand, argues that its limited sales effort reflected nothing more than a natural desire to keep its own com-

puters in business, and to refrain from diverting business to centers using rival computers.

Factually, there is one critical weakness with Kaplan's argument. While there are unquestioned difficulties in switching programs from one make of computer system to another, there are also substantial difficulties involved in switching to different models of the same make of computer. The Burroughs data center and Cubit both used a Burroughs B–300 model, while CompuTerminal used the newer B–2500 model. According to the evidence at trial, the B–300 and B–2500 are entirely different computers, and their computer "languages" are incompatible. In many cases, a switch from a B–300 to a B–2500, or the reverse, requires complete re-programming. Thus, a market definition of Burroughs equipment users would be unrealistic because a client could no more switch from a B–300 to a B–2500 than it could from a B–300 to a Univac computer.

Kaplan, however, argues that a process known as "simulation" enables a B–2500 to run on a program designed for a B–300, and thereby brings all Burroughs computer centers into the same submarket. A "simulator" is simply a deck of programming cards which, in effect, translates a program designed for one model of computer to another. Simulators are usually made by the manufacturer of the computer and, at least in the early Seventies, were not capable of translating programs between different makes of computers.

There was testimony that simulation can cut down the cost of transferring models, at least initially. Michael Stumpf, a sales representative for CompuTerminal at the time of the Burroughs-Cubit transaction, testified that the initial costs of planning and problem definition would be eliminated by simulation.

There also was testimony, however, that the simulation process is by no means foolproof and that significant re-programming costs might still be incurred in switching programs between different models of Burroughs computers. Leonard Palmer testified that when he considered Burroughs' offer to sell its batch processing business, he also figured in the cost of renting a B–300 in case the simulator provided by Burroughs did not function properly. Palmer also noted that in the event re-programming were required, CompuTerminal would have no "significant" competitive advantage over other data centers using different equipment with regard to the Burroughs customers.

Moreover, simulation does not place different models on the same footing in terms of efficiency. The B–2500, regarded as one of the more advanced computers in the industry in the early Seventies, had a capacity to run programs approximately twice as fast as the older and slower B–300. Simulating a B–300 program onto a B–2500, however, forced the B–2500 to operate at the B–300's lower efficiency level. Simulation thus negated the technological advantages of the B–2500 by requiring it to operate at half speed. Palmer testified that even where simulation works, re-programming must be undertaken on a "long-term" basis. Some conflicting testimony was presented on the issue of whether "larger" programs could be successfully simulated on the B–2500.

Giving Kaplan the most favorable inferences to be drawn from the evidence regarding simulation, we find that simulation was, at best, a temporary solution to the costly problem of re-programming. It was also a somewhat unsatisfactory solution in terms of reducing computer efficiency. Thus, while simulation might provide an advantage of sorts to a center using Burroughs equipment in competing for customers already programmed on a Burroughs computer, it was clearly not an advantage justifying the legal conclusion that Burroughs computer centers constituted a submarket for the purposes of the antitrust laws.

*Brown Shoe* compels us to examine a variety of factors in defining relevant submarkets. Kaplan bases its argument for a Burroughs-user submarket solely upon an alleged price differential. Yet, it does not

appear from the evidence that Burroughs users could provide any service significantly different from that provided by users of other makes of equipment, nor does the evidence indicate that either the industry or the public recognized Burroughs as providing substantially unique data processing service. It does not appear that Burroughs appealed to any specialized clientele whose unique needs could be met only by Burroughs data processing equipment. Indeed, it appeared from the evidence that a wide variety of businesses patronized both the Burroughs Data Center and CompuTerminal, including such diverse concerns as real estate firms and insect exterminators.

Kaplan's argument also requires that we accept one implicit assumption. In defining the market as all Burroughs data centers, Kaplan necessarily asks that we disregard all potential data processing clients who were not utilizing batch processing services. Palmer's own testimony indicated that a very wide spectrum of businesses were capable of using electronic data processing at the time of the Burroughs-Cubit transaction. According to Palmer, roughly three levels of businesses were potential data processing clients. "Larger" businesses with sizable operating capital would use batch processing in lieu of expensive in-house computer processing. "Medium"-sized businesses which could not contemplate purchase of their own computers frequently preferred using conventional batch processing to manual forms of processing. Batch processors also catered to "small" businesses who would employ "package" plans which were less expensive than more standard batch processing plans. Even if the market is geographically restricted to San Francisco, the potential clientele in 1970 appears to have been enormous. A measure of competitive impact which relied solely upon those clients already programmed on Burroughs computers would be unrealistic, to say the least.

In sum, even if we allow Kaplan all reasonably favorable inferences, we must find that Kaplan's proposed submarket does not square with the principles of *Brown Shoe*. Accordingly, we reject Kaplan's definition of the market.

## B. *The Data Processing Market in General*

We reiterate that our decision in this appeal is entered only after a through examination of the record below. Having rejected Kaplan's proposed market definition, our review focuses upon other evidence from which a product market might be discerned.

There is literally nothing in the record from which a product market could be defined. What references to competitive conditions in the data processing industry can be found in the record tend to suggest a highly competitive market, not only among batch processors, but also among all forms of data processing service. Sherwin Kalt, president of Diversified Computer Applications (DCA) in Palo Alto, California, testified that DCA competed with IBM data centers, the Burroughs data center, other processors in the Bay Area, banks, and purely manual forms of data processing such as traditional bookkeeping services. Leonard Palmer described the data processing field as a "changing" industry which was far from static in 1970.

Aside from such vague references to the overall data processing market, the record is silent. The great bulk of time at the third trial was spent on proof of intent and damages. The parties have all but ignored the question of market definition until this appeal. In order to arrive at a definition on appeal, we would require far more evidence than has been presented. On the question of "reasonable interchangeability," we would have to see more detailed evidence on both cost and convenience of batch processing and alternative data processing procedures, both computerized and manual. In assessing the impact of the Burroughs-Cubit transaction on competition, we would require a far more complete picture of the data processing market in San Francisco, including some reasonable estimate of the potential for new entrants into the field. In short, we feel absolutely incapable of making even a rough estimate of the effect

of Burroughs' allegedly illegal activities upon competition in such a highly technical and dynamic industry on the basis of this record. As a matter of law, the jury was similarly incapable of judging.

## VI. CONCLUSION

Finding that plaintiff Kaplan failed to present substantial evidence on a critical element of its cause of action, we find that defendant's motion for judgment n. o. v. was properly granted.

AFFIRMED.