815 F.2d 562
 55 USLW 2626, 1987-1 Trade Cases 67,543
 NATIONAL BASKETBALL ASSOCIATION, et al.,
Plaintiff-Counterdefendants- Counterclaimants-Appellants,
v.
SDC BASKETBALL CLUB, INC. and Los Angeles Memorial Coliseum
Commission,
Defendants-Counterclaimant-
Counterdefendants-Appellees.
 No. 86-5891.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 4, 1987.
Decided April 21, 1987.
 
 Michael A. Cardozo, New York City, for plaintiff-counterclaimants-counterdefendants-appellants.
 Christopher Layne and Maxwell M. Blecher, Los Angeles, Cal., Wayne M. Liao and Michael I. Spiegel, San Francisco, Cal., for defendants-counterclaimants-counterdefendants-appellees.
 Appeal from the United States District Court for the Southern District of California.
 Before FERGUSON, NELSON and BEEZER, Circuit Judges.
 FERGUSON, Circuit Judge:
 
 
 1
 Once again this court must consider the application of federal antitrust law to a sports league's effort to restrain the movement of a member franchise. In this case, the league, the National Basketball Association (NBA), seeks declaratory judgment that it may restrain the movement of its franchise, the Los Angeles Clippers (nee San Diego Clippers), and that it may impose a charge upon them for the Clippers' unilateral usurpation of the "franchise opportunity" available in the Los Angeles market. The NBA also seeks declaratory judgment on similar grounds against the Los Angeles Memorial Coliseum Commission (the Coliseum). The district court, believing the result controlled by the decision in the first Los Angeles Raiders case,[1] dismissed the case upon the Clippers' motion for summary judgment. Finding genuine issues of material fact, we reverse and remand to the district court for further proceedings.
 
 I.
 
 2
 The Clippers currently operate a professional basketball franchise in the Los Angeles Sports Arena. The franchise is a member of the NBA, an organization of professional basketball teams that operates as a joint venture under New York law. In the early 1980s, the then San Diego Clippers desired to move their franchise to Los Angeles. The Clippers abandoned their effort after the NBA filed suit in the Southern District of California. The suit was resolved via a stipulation that any subsequent suits regarding a move must be brought in the Southern District.
 
 
 3
 In 1984, this court rendered the decision in Raiders I. The Raiders I panel found that the National Football League (NFL) was not immune from the antitrust laws as a single business entity. 726 F.2d at 1387-90. Possible antitrust violations within the league thus properly are tested by "rule of reason" antitrust analysis. The Raiders I panel found that a reasonable jury applying the rule of reason standard could have found that the NFL violated antitrust laws in restraining Al Davis's Oakland Raiders from moving to the Los Angeles Coliseum. Id. at 1390-98.
 
 
 4
 The then extant clause directly governing the movement of franchises within the NBA, Article 9 of the NBA constitution, was similar to a clause abandoned by the NFL prior to the Raiders' litigation as potentially violative of federal antitrust laws. See Raiders I, 726 F.2d at 1385 & n. 1. Seeing the Raiders I decision as a window of opportunity, the Clippers, through their president Alan Rothenberg, on May 14, 1984, announced to the NBA their move to Los Angeles. They asserted that the move was to take place on the following day and that any action taken by the NBA to restrain that move would violate the antitrust laws. The NBA attempted to appoint an investigatory committee to examine the move, but abandoned the effort in the face of the Clippers' continued assertions that the investigation violated antitrust law. To avoid potential liability, the NBA scheduled the Clippers' games in Los Angeles and made no effort to sanction the club.
 
 
 5
 The NBA asserts that Article 9 was not the only limitation upon franchise movement. Article 9 provided that no team could move into a territory operated by another franchise without that franchise's approval. The Clippers complied with this requirement, as the Los Angeles Lakers agreed in writing to waive their rights under Article 9. The NBA argues, however, that the league as a body must be permitted to consider moves in order to give effect to a number of constitutional provisions for the exclusiveness of franchise territories. Article 9, it contends, limits the actions of the NBA as a league and does not prescribe the only strictures on franchise movement.
 
 
 6
 The NBA also began proceedings to adopt a new rule governing the consideration of franchise moves, later adopted as Article 9A. The NBA argues that Article 9A is a new constitutional provision codifying previous practice. The Clippers argue that Article 9A is rather an amendment to Article 9 that, by virtue of the NBA constitution, must be unanimously approved by the member teams. The Clippers thus argue that Article 9A was not properly adopted at the time of the Clippers' move, when the Clippers voted against it.
 
 
 7
 The NBA brought suit in the Southern District for declaratory judgment that it could as a league consider the Clippers' move to Los Angeles and sanction the Clippers for failing to seek league approval without violating the antitrust laws. It also sought damages from the Clippers on a variety of state-law claims, including breach of fiduciary duty and breach of contract. The NBA sought damages from the Coliseum for tortious interference with the contractual relations between the Clippers and the NBA. The Clippers and the Coliseum responded and counterclaimed against the NBA and individually against its member teams for declaratory judgment that consideration by the NBA of the Clippers' move would violate the antitrust laws.
 
 
 8
 After voluminous pleading and the denial of five summary judgment motions, the district judge suggested on the eve of trial that the NBA could not possibly win its case under the guidelines established in Raiders I. The judge further expressed doubt that the league had any valid provision for the consideration of franchise movement. At the hearing on the final summary judgment motions, he repeated his continuing frustration with the case by noting that he couldn't "see spending my time ... on this case without some instruction from the circuit." The district judge also refused NBA counsel's request for a written opinion.
 
 
 9
 The district judge entered an order granting summary judgment for the Clippers on April 28, 1986. The order awarded the Clippers and the Coliseum declaratory relief but not damages on their antitrust claims. The order dismissed all of the NBA's claims. Although it is not entirely clear, the district court appears to have dismissed the antitrust claims as non-meritorious, and the pendent state claims due to the dismissal of the primary federal claim. The Clippers' and Coliseum's other counterclaims were dismissed by stipulation, and thus the judgment is final for appeal.
 
 
 10
 After the district court granted summary judgment, the Raiders panel rendered its opinion regarding damages and state-law claims. Resting on that decision's award in offset for the "expansion opportunity" lost to the league by the Raiders' move, see Raiders II, 791 F.2d at 1371-73, the NBA requests that this court enter judgment in its favor for the expansion opportunity taken by the Clippers in their move to Los Angeles. The NBA also requests summary judgment on its pendent claims for declaratory relief regarding the effect of the NBA constitution. The NBA further requests that summary judgment on all other counts be reversed and the case remanded for trial.
 
 II.
 
 11
 A district court's grant of summary judgment and its determinations of state and federal law are reviewed de novo. T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors' Ass'n, 809 F.2d 626, 629-30 (9th Cir.1987). In "reviewing a grant of summary judgment, this court sits in the same position as the district court and applies the same summary judgment test that governs the district court's decision." Id. at 630.
 
 III.
 A.
 
 12
 Both the Coliseum and the Clippers contend that there is no "actual controversy" to allow federal jurisdiction over the NBA's request for declaratory judgment. They claim that since the NBA has taken no affirmative action to sanction the Clippers or deny them scheduling rights in Los Angeles, the issues of the case are not sufficiently refined to allow federal jurisdiction.
 
 
 13
 Declaratory judgment actions are justiciable if "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941). Both defendants rely on Hendrix v. Poonai, 662 F.2d 719 (11th Cir.1981) (per curiam), to illustrate a lack of substantial controversy. In Hendrix, a hospital sought a declaration that its refusal to hire a doctor would not violate the antitrust laws. The hospital had not yet refused to hire the doctor. The Eleventh Circuit found that no jurisdiction existed over such "an abstract question 'based upon the possibility of a factual situation that may never develop.' " Id. at 722 (quoting Brown & Root, Inc. v. Big Rock Corp., 383 F.2d 662, 665 (5th Cir.1967)). Defendants argue that the NBA's complaint for declaratory relief, like the hospital's request in Hendrix, is based on a hypothetical set of facts: that the NBA would actually invoke sanctions upon the Clippers, when the league has thus far been unwilling to do so.
 
 
 14
 Whatever the merits of Hendrix,[2] the nature of the relief sought by the NBA is not so speculative. The NBA seeks, in essence, a declaratory judgment holding that it may evaluate and assess limits on franchise movement without violating the antitrust laws. What it seems to assert, albeit somewhat obliquely, is that absent any contractual or antitrust bars, it would have assessed a charge to the Clippers to account for the league's loss of interest in the Los Angeles market. It seeks a declaratory judgment assessing a value of such a charge that is not a restraint in violation of the antitrust laws. The defendants have been in direct conflict with the NBA on all of these issues. They have asserted from the onset of the suit that even the consideration by the NBA of a charge upon the move would violate the antitrust laws.
 
 
 15
 The NBA's claims meet the requirements of the test. The Clippers' and the Coliseum's alternative formulation of case and controversy would force the NBA to impose a fine or sanction on the Clippers before an action could accrue. This is the type of Damoclean threat that the Declaratory Judgment Act is designed to avoid. See Societe de Conditionnement en Aluminium v. Hunter Eng'g Co., 655 F.2d 938, 943 (9th Cir.1981). Since the NBA's "real and reasonable apprehension," see id. at 944, was that any action on the Clippers' move could result in antitrust liability, the case is justiciable.
 
 B.
 
 16
 The Coliseum attempts to discover a further jurisdictional defect: that the district court had no federal question jurisdiction over this case. Since the antitrust issues asserted by the NBA and the Clippers (in their counterclaims) may be resolved by contract issues, the Coliseum argues that no federal jurisdiction may be asserted.
 
 
 17
 The Coliseum's contention is untenable. " 'If ... the declaratory judgment defendant could have brought a coercive action in federal court to enforce its rights,' jurisdiction exists for declaratory relief." Levin Metals Corp. v. Parr-Richmond Terminal Co., 799 F.2d 1312, 1315 (9th Cir.1986) (quoting Janakes v. United States Postal Serv., 768 F.2d 1091, 1093 (9th Cir.1985)) (emphasis added by the Levin Metals court). Since the Coliseum and the Clippers have brandished possible antitrust liability from the onset, and requested antitrust relief in their counterclaims, the NBA may seek declaratory relief from that liability. The existence of a possible defense to the NBA's suit for declaratory relief (i.e., that the NBA has no right under the contract to consider the move) does not defeat federal jurisdiction. See Air Prods. & Chems., Inc., v. Reichhold Chems., Inc., 755 F.2d 1559, 1563 (Fed.Cir.) (existence of a state law defense, even if pleaded in the complaint for declaratory judgment, does not defeat subject-matter jurisdiction), petition for cert. dismissed by agreement of the parties, 473 U.S. 929, 106 S.Ct. 22, 87 L.Ed.2d 700 (1985). Any other rule would allow declaratory judgment defendants to avoid federal jurisdiction by interposing frivolous state law claims that potentially defeat federal liability.
 
 IV.
 A.
 
 18
 This court will uphold a grant of summary judgment only if there remain no genuine issues of material fact and if the district court properly applied the law to the facts. On review, this court views the facts in the light most favorable to the nonmoving party. Ashton v. Cory, 780 F.2d 816, 818 (9th Cir.1986). Summary judgment is disfavored, of course, in heavily factual settings such as complex antitrust cases that involve issues of motive and intent. See Poller v. CBS, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). While the proper case may warrant summary judgment, see, e.g., Barry v. Blue Cross, 805 F.2d 866, 871 (9th Cir.1986), in this case there remain genuine issues of fact and summary judgment should not have been granted.
 
 
 19
 The antitrust issues are directly controlled by the two Raiders opinions, although the district judge had the benefit only of Raiders I when he rendered judgment. Collectively, the Raiders opinions held that rule of reason analysis governed a professional sports league's efforts to restrict franchise movement. More narrowly, however, Raiders I merely held that a reasonable jury could have found that the NFL's application of its franchise movement rule was an unreasonable restraint of trade. See Raiders I, 726 F.2d at 1398. Raiders II confirmed that the jury's liability verdict affirmed in Raiders I "held Rule 4.3 [the franchise movement rule] invalid only as it was applied to the Raiders' proposed move to Los Angeles." Raiders II, 791 F.2d at 1369. The Clippers' and the Coliseum's efforts to characterize Raiders I as presenting guidelines for franchise movement rules are thus unavailing. Neither the jury's verdict in Raiders, nor the court's affirmance of that verdict, held that a franchise movement rule, in and of itself, was invalid under the antitrust laws.
 
 
 20
 Raiders I did establish the law of this circuit in applying the rule of reason to a sports league's franchise relocation rule, "a business practice in an industry which does not readily fit into the antitrust context." Raiders I, 726 F.2d at 1391. Any antitrust plaintiff "must prove these elements: '(1) An agreement among two or more persons or distinct business entities; (2) Which is intended to harm or unreasonably restrain competition; (3) And which actually causes injury to competition.' " Id. (quoting Kaplan v. Burroughs Corp., 611 F.2d 286, 290 (9th Cir.1979), cert. denied, 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116 (1980)). The Raiders I panel carefully examined the structure of professional football in applying the Kaplan standard, a structure in which the "teams are not true competitors, nor can they be." Id. The Raiders I panel concluded that the relevant market for professional football, the history and purpose of the franchise-movement rule, and the lack of justification of the rule under ancillary-restraint doctrine all supported the jury's verdict. In so doing, of course, the panel set down no absolute rule for sports leagues. Instead, it examined the facts before it and concluded that the jury's conclusion that the NFL violated the antitrust laws was supported by the record.
 
 
 21
 Yet the Clippers argue, as they must to support summary judgment, that the "NBA three-quarters rule ... is illegal under Raiders I "--i.e., either that the NBA rule is void as a matter of law under Raiders I, or that the NBA has not adduced genuine issues of fact to allow the rule to stand. The Clippers assert that the rule "is illegal as applied ... [but that under Raiders I ], a professional sports league's club relocation rule must at least be 'closely tailored' and incorporate objective standards and criteria such as population, economic projections, playing facilities, regional balance, and television revenues." Putting to the side, for the moment, NBA's adamant and repeated assertions that such standards have been incorporated in the evaluation of franchise movements, the Clippers misperceive the effect of the Raiders cases. The Clippers' confusion, and that of a number of commentators,[3] may derive from the Raiders I panel's painstaking efforts to guide sports leagues toward procedures that might, in all cases, withstand antitrust analysis. See Raiders I, 726 F.2d at 1397. The objective factors and procedures recounted by the Clippers are "well advised," id., and might be sufficient to demonstrate procompetitive purposes that would save the restriction from the rule of reason. They are not, however, necessary conditions to the legality of franchise relocation rules.
 
 
 22
 Since a careful analysis of Raiders I makes it clear that franchise movement restrictions are not invalid as a matter of law, for the district judge to grant summary judgment against the NBA, he must have found that the NBA had adduced no facts upon which a reasonable jury could have found that NBA consideration of the Clippers' move was a reasonable restraint of trade. As we have demonstrated, antitrust analysis under Raiders I indicates that the question of what restraints are reasonable is one of fact. We believe that numerous issues of fact remain.
 
 
 23
 The NBA asserts a number of genuine issues of fact: (1) the purpose of the restraint as demonstrated by the NBA's use of a variety of criteria in evaluating franchise movement, (2) the market created by professional basketball, which the NBA alleges is substantially different from that of professional football, and (3) the actual effect the NBA's limitations on movements might have on trade. The NBA's assertions, if further documented at trial, create an entirely different factual setting than that of the Raiders and the NFL. Further, as the NBA correctly notes, the antitrust issue here is vastly different than that in the Raiders cases: the issue here is "whether the mere requirement that a team seek [NBA] Board of Governor approval before it seizes a new franchise location violates the Sherman Act." The NBA here did not attempt to forbid the move. It scheduled the Clippers in the Sports Arena, and when faced with continued assertions of potential antitrust liability, brought this suit for declaratory relief. Given the Raiders I rejection of per se analysis for franchise movement rules of sports leagues, and the existence of genuine issues of fact regarding the reasonableness of the restraint, the judgment against the NBA must be reversed.
 
 
 24
 Similarly, the district court's grant of summary judgment for antitrust declaratory relief to the defendants ignores genuine issues of fact and misinterprets Raiders I, and must be reversed. The district court granted the Clippers judgment on their Count I, which asserted that Article 9, Article 9A if effective, and any meeting of the NBA to consider the Clippers' move, all violate the antitrust laws. Raiders II, however, reemphasized that only the particular application of the franchise movement rules in that case violated antitrust law. The mere existence of Article 9, Article 9A, and various provisions for franchise movement evaluation, cannot violate antitrust law. Further, the NBA has adduced sufficient facts to create a genuine issue of the reasonability of the restraint.
 
 B.
 
 25
 The district judge also dismissed the NBA's request for a declaration that the NBA constitution allowed the league to consider the Clippers' move. A glance at the briefs and the pleadings below reveals a wealth of factual disputes. Defendants argue that the NBA constitution contains no other restriction on the movement of franchises than the admittedly invalid Article 9. Since the replacement provision, Article 9A, was not in place at the time of the Clippers' move, defendants argue that the NBA had no right to consider, condition, or approve the Clippers' move. The NBA's argument has always been, however, that the general NBA provisions regarding the territories of franchises imply the right of the league to consider and condition the movement of franchises. The league cites long-standing precedent for the imposition of charges upon new franchises. The parties are in dispute about the previous imposition of charges for the movement of franchises to new territories. The defendants argue that the absence of an express agreement regarding such regulation indicates that no regulation was intended. The NBA argues that precedent within the league and the existence of various provisions providing for careful allocation of franchise territories create an implied provision.
 
 
 26
 The interpretation of the agreement hinges upon undetermined issues of fact. Despite defendants' arguments that the facts in dispute are irrelevant, Article 9 governed only the approval of the team whose territory was invaded. Depending upon the intent of the parties, it seems plausible either that no further regulation was intended or that the league as a whole would have final approval to effectuate the territorial concerns of other provisions.
 
 
 27
 Cases cited by defendants, denying evidence of custom or usage where no ambiguity is present, and those cited by the NBA, employing the ongoing construction of the contract by the parties, are not in conflict. Since the defendants' construction of the agreement would render meaningless both the territoriality concepts implicit in the agreement and what is at least alleged, if not yet proven, past practice, evidence of the intent of the parties should be allowed. As one court noted, where practice conflicts with the language of the agreement as it may appear to the court, "the parties by their actions have created the 'ambiguity' required to bring the rule into operation." Crestview Cemetery Ass'n v. Dieden, 54 Cal.2d 744, 754, 356 P.2d 171, 178, 8 Cal.Rptr. 427, 434 (1960). Evidence of intent, of course, is a question of fact. Conclusory assertions that "the silence of the NBA constitution on franchise relocations is clearly a matter of deliberate omission" do not serve to change this. Since there are genuine issues of fact, summary judgment for the defendants on this issue must be reversed, and the NBA's request for judgment from this court is denied.
 
 C.
 
 28
 The NBA also raised in its complaint a number of noncontract pendent claims that were dismissed by the summary judgment. The league argues that the Clippers violated fiduciary duties imposed upon joint venturers as well as contractual duties imposed upon contract parties. The league argues that the Coliseum tortiously interfered with the joint venture. These claims were not addressed by the defendants' summary judgment motions or by any of the parties at argument of those motions. While the other, contract-related, pendent claims rise or fall with the defendant's contract-based defense to declaratory relief, these claims are logically unrelated to that defense.
 
 
 29
 Without the benefit of an opinion, this court can only assume that these pendent state claims were dismissed as a result of the dismissal of the federal claims. See Schultz v. Sundberg, 759 F.2d 714, 718 (9th Cir.1985) (holding that the district court may exercise its discretion to dismiss pendent claims after dismissal of federal claims on summary judgment). The better practice would have been to dismiss without prejudice. See Brandwein v. California Bd. of Osteopathic Examiners, 708 F.2d 1466, 1475 (9th Cir.1983).
 
 
 30
 The Clippers assert that Raiders II demands dismissal of state-law claims for breach of the implied promise of good faith and fair dealing. The Raiders II decision, however, dismissed the Raiders' recovery on those grounds because, on the evidence presented in that case, the only reasonable conclusion was either that no party breached that promise, or that both parties had. 791 F.2d at 1362-63. The issue in this case is clearly not identical to that in Raiders. It is not clear which party, if any, broke the duty of good faith and fair dealing. It therefore presents yet another question to be determined at trial before the district court.
 
 
 31
 The NBA requests that this court enter judgment for it under the "expansion opportunity" theory of damages discussed in Raiders II. 791 F.2d at 1371-73. The majority in Raiders II, however, found only that the expansion opportunity taken by the Raiders in their move to Los Angeles limited the Raiders' recovery of antitrust damages. The majority revealed nothing about the origin of that offset. Therefore, the existence of a recovery for expansion opportunity must find its source somewhere other than antitrust law: i.e., the express or implied provisions of the NBA constitution. This theory, however, presents issues of fact and is properly left to the district court.
 
 CONCLUSION
 
 32
 The pervasive issues of material fact that remain warrant the return of this case, in its entirety, to the district court for trial. We therefore reverse the district court's grant of summary judgment and remand the case to the district court for trial.
 
 
 33
 REVERSED and REMANDED.
 
 
 
 [1]
 Los Angeles Memorial Coliseum Comm'n v. National Football League, 726 F.2d 1381 (9th Cir.), cert. denied, 469 U.S. 990, 105 S.Ct. 397, 83 L.Ed.2d 331 (1984) [hereinafter Raiders I ]; see also Los Angeles Memorial Coliseum Comm'n v. National Football League, 791 F.2d 1356 (9th Cir.1986) [hereinafter Raiders II ]
 
 
 [2]
 The court in Hendrix appears to overlook that all declaratory judgments will be in some sense hypothetical, since they are premised on the understanding that the prospective plaintiff has not yet filed suit and the prospective defendant wishes to determine his or her liability. The issue is not whether the requested declaratory relief is hypothetical. Rather, the issue is whether the case presents a sufficiently concrete case and controversy upon which relief properly may be fashioned
 
 
 [3]
 See, e.g., Roberts, Sports Leagues and the Sherman Act: The Use and Abuse of Section 1 to Regulate Restraints on Intraleague Rivalry, 32 UCLA L.Rev. 219, 280-81 (1984) (recognizing the Raiders I decision as the affirmance of a jury verdict, yet arguing that Raiders I "effectively bars a league from preventing relocation to an area where another member club is already based"); Weistart, League Control of Market Opportunities: A Perspective on Competition and Cooperation in the Sports Industry, 1984 Duke L.J. 1013, 1014, 1026 (recognizing Raiders I as the affirmance of a jury verdict based upon a particular situation, but arguing that the case allows the uncompensated diversion of "an exquisite corporate opportunity"); Comment, Keeping the Home Team at Home, 74 Calif.L.Rev. 1329, 1332 & n. 19 (1986) (assuming that the Raiders decisions remove control of franchise movements from sports leagues) [hereinafter cited as Gray Comment]