**REBORN ENTERPRISES, INC.,
Plaintiff,**

v.

**FINE CHILD, INC., Andrews MacLaren, Inc., Andrews MacLaren Ltd., Ben's for Kids, Inc., James Fine, and Mark Wein, Defendants.**

No. 82 Civ. 2451 (ADS).

United States District Court,
S.D. New York.

June 20, 1984.

Edmonds & Co., New York City, for defendants James Fine and Fine Child, Inc.; Robert C. Edmonds, New York City, of counsel.

Kane, Dalsimer, Kane, Sullivan & Kurucz, New York City, for defendants Andrews MacLaren, Inc., and Andrews MacLaren, Ltd.; Joseph C. Sullivan, New York City, of counsel.

Robinson, Perlman & Kirschner, P.C., New York City, for plaintiff; Allan J. Kirschner, Lawrence M. Rosenstock, New York City, of counsel.

Cohn & Blau, New York City, for defendants Mark Wein & Ben's for Kids, Inc.; Sharon Blau, Frederick H. Cohn, New York City, of counsel.

## OPINION AND ORDER

SOFAER, District Judge:

Reborn Enterprises, Inc. ("Reborn") brought this action in April 1982 against defendants, Andrews MacLaren Ltd. ("MacLaren Ltd."); Andrews MacLaren Inc. ("MacLaren Inc."); Ben's for Kids, Inc. ("Ben's"); Mark Wein ("Wein"), the since deceased former president of Ben's; Fine Child Inc. ("Fine Child"); and James Fine ("Fine"), president of Fine Child. Reborn seeks damages based upon alleged violations of federal and state antitrust laws and of common law contractual rights. Plaintiff alleges that defendants engaged in conduct constituting *per se* violations of section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, by forming horizontal and vertical contracts, combinations, and conspiracies to fix prices, by imposing restrictions on the territories in which various retailers could sell the MacLaren Baby Buggy, and by engaging in concerted refusals to deal and tying arrangements. Plaintiff claims that the tying arrangements were also unlawful under section 3 of the Clayton Act, 15 U.S.C. § 14. Alternatively, plaintiff maintains that the conduct amounted to an unreasonable restraint of trade under a "rule of reason" analysis. Plaintiff also alleges that defendants monopolized, attempted to monopolize, and conspired to monopolize commerce in violation of section 2 of the Sherman Act, 15 U.S.C. § 2, and that defendants Fine Child, Fine, Ben's, and Wein engaged in illegal price discrimination in violation of section 2 of the Robinson-Patman Act, 15 U.S.C. § 13(a), (d), (f). Plaintiff further claims that defendants violated sections 340 and 369–a of New York's Donnelly Act. N.Y.Gen.Bus.Law §§ 340, 369–a. Finally, Reborn contends that defendants tortiously breached contracts with Reborn and maliciously conspired to interfere with Reborn's advantageous business relationships. Thus, Reborn contends, defendants are jointly and severably liable for compensatory, treble, and punitive damages, as well as for costs and attorney's fees. Reborn requests that the court permanently enjoin defendants from refusing to sell MacLaren strollers, parts, and accessories to Reborn and order them to make such strollers, parts and accessories available to Reborn.

Defendants Fine and Fine Child counterclaimed against Reborn and its attorneys for defamation based on a letter charging defendants with illegal conduct, sent by Reborn's attorneys to all defendants on January 15, 1982. By order dated August

30, 1982, the defamation claim was severed from the antitrust claims, to be tried separately after all other issues were determined.

After exhaustive discovery, the case was placed on the ready trial calendar in January 1984. At that time, defendants raised a variety of motions which taken together seek dismissal and/or summary judgment against all plaintiff's claims. For the reasons that follow, summary judgment is granted on behalf of all defendants on the federal antitrust claims. The pendent state claims are dismissed without prejudice to plaintiff's right to pursue them in an appropriate court, in which the defamation counterclaim may also be asserted.

## I. *Factual Background*

Reborn is a New York corporation that operates eight retail stores in New York, New Jersey, and Connecticut. Its Manhattan store is located on Third Avenue and 82nd Street. Matthew Wallis, who founded Reborn in 1976, is its president and chief executive officer. Reborn is a discount maternity shop selling primarily maternity clothing and, for a time, the MacLaren Baby Buggy. Wallis sometimes also sells non-clothing items such as wallets and pocketbooks that he acquires by buying the inventory of maternity stores which have gone out of business. Wallis' pricing policy is to buy his goods at wholesale, to determine the retail price at which other companies are selling particular items, and then to sell those items for less. Wallis 317.

MacLaren Ltd. is a relatively small British company that manufactures and sells a line of folding baby strollers and related equipment. Its goods are sold throughout Europe and in the United States. Until May 1980, MacLaren Ltd. sold its stroller directly to customers in the United States. On May 1, 1980, MacLaren Ltd. formed a wholly owned subsidiary named MacLaren Inc., a corporation organized under the laws of New York, to act as the sole distributor of its stroller in the United States. This arrangement has continued since that time, except for the period between November 1981 and May 1983, during which Fine Child acted as sole distributor for MacLaren in the United States.

Fine Child was a New York corporation, incorporated in 1975, which sold infant products to juvenile stores. Fine Child was not a prime manufacturer, but sold imported products on a finished goods basis, or on an exclusive license basis. It also sold products it designed and then subcontracted out for manufacture. Fine 11. James Fine was Fine Child's president, chief executive officer, and sole stockholder. By early 1983, when Fine Child had failed financially and had been taken over by Sassy Seat, Inc., also a juvenile goods company, Fine was hired by Sassy Seat and now serves as the company's president.

Ben's for Kids is a New York corporation consisting of a single retail store located on Third Avenue between 78th and 79th Streets. It sells furniture and clothing for children up to three years of age. Mark Wein was Ben's sole stockholder and chief executive officer during all times relevant to this litigation. His pricing policy was to charge as much as he could get for a product without losing customers. Wein 18. Ms. Kurzman, a MacLaren Inc. employee, had worked at Ben's, and her brother is currently employed there.

During the 1970's, MacLaren Ltd. invented a lightweight infant umbrella stroller which could fold easily and was virtually unbreakable. All parties agree that it is one of the finest of all baby strollers. Plaintiff claims that it is known as the "Rolls Royce" of strollers. Plaintiff's Pretrial Memorandum at 6; Kurzman 43–46. Despite its high price, it sells well because of its outstanding quality. The MacLaren stroller was originally sold in Europe. In 1979 the company decided to "test the waters" in the United States by selling at first to only one juvenile goods store while monitoring the stroller's success. Around this time, Wein spotted the stroller at a trade show in England, and arranged with MacLaren Ltd. to purchase it. From 1979 through early 1980, Ben's purchased directly from MacLaren Ltd. and was the only

store in the United States carrying the stroller.

The stroller sold well at Ben's. MacLaren Ltd. was impressed with the quality of Wein's store, the relationship Wein had with his customers, and his policy of providing extensive post-sale repair service. Then and now MacLaren Ltd. has worked hard to maintain a strong, positive relationship with Ben's. Satisfied that its stroller would sell well in the United States, MacLaren Ltd. formed MacLaren Inc. to handle sales here.

In August 1980, Wallis, owner of the Reborn maternity store, located near Ben's on the Upper East Side of Manhattan, noticed the MacLaren stroller being sold at Ben's. He contacted MacLaren Inc. and sought to place an order. Barbara Kurzman, then employed by MacLaren Inc., visited Reborn. After her visit, she decided it would be unwise for MacLaren Ltd. to do business with Reborn. She reasoned that because it was a maternity shop which sold no juvenile goods, it would ill fit MacLaren's marketing strategy, which was to sell only to juvenile goods shops. Kurzman 46–49. MacLaren believed that a juvenile goods store was more suitable for selling MacLaren strollers than a maternity shop because customers have the opportunity in a juvenile goods store to compare the MacLaren stroller with strollers of other brands and the proprietor has more knowledge about strollers. Kurzman 45–46. Ms. Kurzman also felt it would be unwise for MacLaren to deal with Reborn because of its close proximity to Ben's. Kurzman explained her position to Ian Jones, Export Sales Manager of MacLaren Ltd., and to George Hambleton, Vice President of MacLaren Inc. Kurzman did, however, inform Jones that Reborn wanted to purchase the stroller. Jones made a note on a telex that he would contact Reborn in November 1980, the next time he planned to visit New York.

During Jones' visit in November, he opened new accounts in Manhattan and Brooklyn at Schneider's Juvenile Furniture, Albee's Baby Carriage, Yeedl's, Berkowitz, and Hatzlacha, all well established juvenile goods stores which sold both "hard" and "soft" goods for very young children. ("Hard" goods include juvenile furniture: strollers, high chairs, car seats, carriages, cribs, and the like, while "soft" goods include baby clothing, bibs, and other accessories.) Jones or Kurzman gave Ben's and all other retailers a "suggested price list," and asked them to try and charge about the suggested price. Kurzman 13–16; see Hambleton 73–75. During his visit, Jones told Wein he thought it unlikely that any other store on the Upper East Side would receive the stroller, and he did not contact Wallis. Jones 53.

The depositions and other evidence indicate that those involved in sales at both MacLaren Ltd. and MacLaren Inc. were ambivalent about doing business with Reborn. As a maternity store, with no repair facilities, and with the habit of cutting suggested retail prices, Reborn did not fit MacLaren's marketing strategy. Furthermore, MacLaren had carefully cultivated its relationship with Ben's, which was located close to the Reborn store. Consequently, a year passed between Wallis' initial inquiry and MacLaren's decision seriously to examine Reborn as an account.

In March 1981, Kurzman, acting as a representative of MacLaren Inc., visited Reborn, which by then had moved to a larger store. She told Wallis outright that MacLaren was reluctant to deal with him because he sold no other juvenile goods and because there was ample distribution of the stroller on the Upper East Side. She asked Wallis if he would agree not to sell the stroller from his Upper East Side store, and Wallis acceded in order to increase his chances of getting the stroller. Kurzman 113. Kurzman stated "Wallis has given me his word as a gentleman that if indeed we open him as an account, that he will not sell in his New York Store." Kurzman 114. Kurzman also told Wallis that MacLaren would appreciate his selling the stroller close to the suggested retail price. Kurzman 124–25. Nevertheless, after the meeting Kurzman again advised MacLaren

that in her opinion the company should not deal with Reborn.

In April 1981, Mr. Hambleton himself visited Reborn's Manhattan store. Despite Kurzman's suggestion, he agreed to open an account with Wallis because he liked the fact that Reborn had eight outlets and an extensive advertising campaign. He asked Wallis not to sell the stroller from Reborn's Upper East Side store until Hambleton had had a chance to talk to Wein. Hambleton 67–68. Wallis grudgingly agreed. Wallis 214–215. Hambleton did not set a specific time by which he would talk to Wein, and did not condition MacLaren's sale to Wallis upon Wallis' promise not to sell from the Upper East Side. Hambleton also told Wallis that Reborn should try to sell near the suggested retail price if possible, but that MacLaren understood they could not require retailers to adhere to the price. Hambleton 72–73. Wallis agreed to consider this suggestion and entered an order for a quantity of strollers. Plaintiff Exhibit 9.

In early April 1981, the first shipment of MacLaren strollers bound for Reborn was misdelivered to Ben's through an error of the trucking company, whose driver had been accustomed to delivering strollers to Ben's when his truck entered that part of town. Upon learning of the trucker's error, Wein promptly returned the misdelivered goods to the company, and the shipment was then properly delivered to Reborn's Manhattan store. Wallis became very suspicious and agitated by the misdelivery. He persistently called Hambleton and Kurzman, insisting that the misdelivery was purposeful and accusing MacLaren of conspiring to deprive him of the stroller because he was a discounter. When the shipment was redelivered to Reborn, Wallis refused the goods, contending that all the boxes had been opened. The boxes were returned to the warehouse and examined by Kurzman, who claims that only two had been opened. Hambleton 90. The open boxes were sealed, the shipment went back to Wallis, and he accepted it.

After the misdelivery incident, Kurzman, Hambleton, and Wallis had lunch in an attempt to "improve relations." Hambleton 104. At this meeting, Wallis threatened to sue MacLaren. He also said that he had been taping all conversations with MacLaren Inc., that he believed a sinister motive existed for the misdelivery, and that he feared that MacLaren Inc. was going to cut him off because he was a discounter. Hambleton tried to assure him that Reborn's pricing policy would not influence their decision to do business with him. Wallis remained suspicious.

Throughout April, Wallis repeatedly called Hambleton to find out whether or not he had spoken to Wein, so Wallis could begin selling strollers from Reborn's upper east side store. Hambleton had not done so, allegedly due to the aggravation Wallis had caused him during the month. Wallis nevertheless began to sell the stroller from Reborn's Upper East Side store. Hambleton claims this was done without his approval, but Wallis maintains that Hambleton told him to go ahead. Wallis 215. In any event, no person from MacLaren took any action to prevent Wallis from selling from the Upper East Side once he had begun, and Reborn quickly became one of MacLaren's largest accounts.

After the April misdelivery, Wein called Hambleton of MacLaren Inc. and Alan Nash and Ian Jones of MacLaren Ltd. to ask why MacLaren was selling its stroller to Reborn, a maternity store. He was told by all that the company wanted to see how the arrangement would work out. Subsequently, Wein walked by Reborn's Manhattan store, noticed the stroller displayed in the window, and went in to talk to Wallis. Tempers flared, and Wallis ended up ejecting Wein from the store and summoning the police. Wallis 366.

Despite requests from MacLaren Inc. to try to adhere to the suggested retail price, Reborn continued to discount. Pltf. Pretrial Memo. at 26. MacLaren Inc. began to receive complaints from Wein and its other customers that Reborn was selling the stroller at a predatory price, that it did not

have repair facilities, and that it was inappropriate for a maternity store to sell baby strollers. They did not threaten to stop buying from MacLaren unless Reborn were terminated, but merely voiced dissatisfaction. Weintraub 49; Leffler 30–33; Waxman 57–58. Both Kurzman and Hambleton informed the callers that nothing could be done. Weintraub 49.

A few of MacLaren Inc.'s other accounts sold below the suggested retail price. Complaints had been received about Berkowitz and Hatzlacha. Kurzman told the proprietor of Hatzlacha that MacLaren wanted retailers to sell the stroller near the suggested retail price, because it was trying to introduce a new product in America. Kurzman 68. None of these stores, however, was ever threatened, forced, or coerced into selling at the suggested retail price. When Hatzlacha, for example, continued to sell below that price, MacLaren took no further action.

MacLaren Inc.'s distribution capability was restricted due to its limited personnel and facilities. MacLaren decided that United States distribution of the stroller would be profitable only if an organized national distributor with a staff larger than MacLaren Inc.'s were to handle the operation. Also, Hambleton was becoming increasingly involved in an organization for the blind which consumed almost all of his time. Hambleton 136. After a comprehensive search, MacLaren selected Fine Child, Inc., a New York corporation with an excellent reputation in the sale of infant products to juvenile goods stores, as its new distributor. An agreement in principle was reached between MacLaren and James Fine in October 1981 for a one-year period to commence January 1982. The arrangement was publicly announced in a press release at the Juvenile Products Manufacturers Association Trade Show in Dallas, Texas, on October 25, 1981, and in January 1982 Fine Child replaced MacLaren Inc. as the exclusive distributor of the MacLaren stroller in the United States. Pltf. Exh. 47.

MacLaren and Fine Child understood the distributorship agreement to give Fine Child complete autonomy to choose with whom it would do business, according to Fine's marketing strategy. Cross 106. In addition, the parties agreed that Fine would have authority to resolve disputes if MacLaren Ltd. chose not to get involved:

[I]n the event of any dispute arising between the Distributor and any purchaser or proposed purchaser in relation to the sale or offer for sale of the Products [Distributor shall] forthwith inform MacLaren of the details and circumstances of the dispute. Within five days of such notice, MacLaren shall at its option elect to pursue or not pursue such dispute, in which latter event the Distributor shall have the exclusive right to pursue, settle or otherwise dispose of the dispute.

Distributorship Agreement ¶ 4(m), at 7 (Pltf.Exh. 144).

Fine Child's marketing strategy for the national distribution of the stroller was "to concentrate on independent full line juvenile products retailers around the country and perhaps a few department stores with full juvenile departments." Fine believed it was essential that in each store where the stroller would be placed there be sales people knowledgeable about the product. Fine 157. He thought that "consumer word of mouth was far and away the best advertising and best promotion that a product can have; ... new parents ... talk to one another a great deal ... we wanted that kind of consumer to be sold, to have the MacLaren attributes explained to them as thoroughly and as knowledgably and as convincingly as possible, by those people in the industry, those retailers who have been dealing in these kinds of goods for years and years." Fine 158.

Hambleton and Kurzman provided Fine with information on all MacLaren Inc.'s accounts. Most of the accounts were familiar to Fine because he had previously done business with them. He was not, however, familiar with Reborn. Kurzman and Hambleton told Fine that they had had problems with Wallis, that his store was not a juvenile goods store, that Reborn was a discounter and had inadequate repair fa-

cilities, but that it was one of MacLaren's largest accounts. Kurzman 159. They did not tell Fine whether or not to sell to Wallis, but this presentation might well have suggested that Fine should terminate the account. MacLaren had itself been supplying the account, however, and no evidence supports the contention that MacLaren insisted on its termination.

In October 1981, Reborn attempted to place an order for one hundred B30 model strollers with MacLaren Inc. but was advised by Kurzman that MacLaren was currently out of stock on that model and that MacLaren Inc. would no longer be handling distribution of the strollers in the United States. Wallis demanded to know the identity of the new distributor, but was told that the distributor would contact Wallis. Kurzman meanwhile turned Wallis' order over to Fine. During October Kurzman went to Reborn to pick up a stroller for repair, and told Wallis that the new distributor might not do business with him because he could not adequately repair the strollers. Kurzman 171; Wallis 243. Wallis interpreted this as a threat and evidence of a conspiracy to cut him off because he was a discounter. He conceded, however, that "she didn't tell me what the new people were going to do." Wallis 241. Wallis repeatedly called MacLaren Inc. to get the name of the new distributor and to find out when to expect the strollers. He complained then, and claims now, that MacLaren had changed distributors in order to stop dealing with Reborn because it was a discount store. He was abusive to whomever he spoke, and tied up their switchboard for days. Kurzman 182. He became increasingly agitated, threatened to sue, and alleged the existence of multiple conspiracies to cut him off.

Reborn claims that MacLaren Inc.'s refusal to identify the new distributor was part of a scheme to terminate the account. It contends that all other customers received a formal announcement of the change in October. MacLaren Inc. did in fact prepare a letter informing all of its customers that Fine Child was to become the new United States distributor of the MacLaren stroller. It sent this letter to Fine for him to distribute. He never did so, however, and many customers did not find out about the change until after January 1982, when Fine Child actually assumed control and began handling all orders and billings. Certainly Fine Child's selection was no secret: a press release issued by MacLaren in late October announced the change. Reborn seems correct in contending that MacLaren Inc. treated it differently than other customers during October and November as Kurzman refused to identify Fine Child to Wallis, whereas she did tell others who inquired that Fine Child was to become the new distributor. Kurzman 164. This had no binding effect on Fine Child, however, and in fact had little if any practical effect on Reborn's ability to obtain strollers. On November 19, 1981, Reborn received its last shipment of strollers from MacLaren Inc. Plaintiff's Ex. 26. At about the same time, Kurzman identified Fine Child to Wallis and gave him Fine's telephone number.

Fine, too, treated Reborn differently than he did other potential customers. He was definitely inclined against doing business with Reborn. A Fine Child agent told Mr. Leffler of Darling's in November that Fine Child was not going to sell to Reborn. Leffler 39–40. Kurzman and Jones testified that in November Fine told them that he was not planning to do business with Reborn. Kurzman 194. At the end of November 1981, Fine told Wallis he wanted a written purchase order to evaluate him as a new account, although Fine did not insist on written orders from some other stores. Fine also asked Wallis if he carried any other Fine Child products or juvenile goods. Wallis said no, but requested that Fine send him a catalogue and a price list. Fine 172.

Fine sent nothing to Wallis for at least two weeks. This may have seemed insignificant to Fine, since he was to become distributor on January 1, 1982, and only received the first shipment of strollers for resale at the end of January. To Wallis, however, Fine's failure to follow up on his

conversation in late November proved he was conspiring to terminate the Reborn account. Two weeks after their telephone conversation, Wallis called Fine and accused him of conspiring with Reborn's competitors, creating illegal tying arrangements, and discriminating against Reborn because it was a discounter. Wallis threatened to sue Fine, insisted that he had sued others before, and told Fine that he was recording their conversation. During this second conversation, Fine told Wallis that his company would not do business with Reborn.

Reborn's attorneys began charging Fine Child and all the other defendants with illegal acts in January 1982. During that month Wallis, trying to bypass Fine Child, wrote to MacLaren in England and asked for strollers. MacLaren informed Wallis that at that time they were not in a position to decide who should receive strollers in the United States. This lawsuit followed in February 1982.

Some time during the spring of 1982, after the filing of the suit, Fine Child sold fifty MacLaren strollers to a Massachusetts maternity retail store called Stork Time. Fine believed that Stork Time was not solely a maternity shop, because it also requested and purchased a number of Fine Child's other juvenile products. Fine 234; Pltf.Exhs. 58–59. In July 1982, Fine discovered that the strollers sold to Stork Time were not in its store but had been resold to Wallis. Fine then stopped dealing with Stork Time. Fine 240.

In May 1983, due to Fine Child's crumbling economic position, MacLaren Ltd. terminated the distributorship agreement. MacLaren Inc. again became the sole distributor and remains so today. Reborn immediately placed an order for strollers, but MacLaren Inc. refused to fill it. Wallis then contacted Maxwell Cross, MacLaren Ltd.'s former marketing manager, and threatened to start a second lawsuit if MacLaren Inc. did not honor his order. Cross 88–90. MacLaren has taken the position that it will do no business with a company with which it is in litigation. Cross 58–59.

From December 1981 through the present, Wallis has made no effort to purchase and sell any other high priced, high quality baby stroller, such as Perego or Aprica, MacLaren's stiffest competition.

## II. *Summary Judgment*

■ Summary judgment is to be granted sparingly in antitrust litigation, especially where an allegation of conspiracy raises issues of fact as to motive and intent. *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); *George C. Frey Ready-Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.,* 554 F.2d 551, 554–55 (2d Cir. 1977). In deciding whether to grant summary judgment, moreover, the court must view the facts in the light most favorable to the party opposing the motion, and all possible inferences must be resolved in that party's favor. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam); *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir.1980). The moving party has the burden of showing that there is no genuine issue for trial as to any material fact, and that it is entitled to judgment as a matter of law.

■ Summary judgment is nevertheless appropriate in some antitrust cases. Where a complete pretrial record shows there is "no genuine issue of material fact, and ... the resisting party does not present a record sufficient to support a reasonable finding in his favor, a district court has a duty to grant the motion for summary judgment." *Filco v. Amana Refrigeration, Inc.,* 709 F.2d 1257, 1260 (9th Cir.1983), *cert. dismissed,* — U.S. —, 104 S.Ct. 385, 78 L.Ed.2d 331 (1984); *see First National Bank of Arizona v. Cities Services Co.,* 391 U.S. 253, 288–90, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968). Rule 56(e) makes clear the task of the party opposing the motion:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response ... must set

forth specific facts showing there is a genuine issue for trial.

*See SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir.1978); II P. Areeda & D. Turner, *Antitrust Law* ¶ 316 (1978). The Supreme Court has approved awards of summary judgment in antitrust cases, *see, e.g., First National Bank of Arizona*, 391 U.S. at 274–88, 88 S.Ct. at 1585–92, as has the Second Circuit, *see, e.g., Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co.*, 614 F.2d 832, 839–42 (2d Cir.1980); *Modern Home Institute, Inc. v. Hartford Accident & Indemnity Co.*, 513 F.2d 102, 109–11 & n. 10 (2d Cir.1975). Summary judgment is particularly appropriate where, as here, extensive discovery has been taken, *Giant Paper and Film Corp. v. Albermarle Paper Co.*, 430 F.Supp. 981, 983–84 (S.D.N.Y.1977), and legitimate business reasons have been advanced for defendants' conduct, *First National Bank of Arizona*, 391 U.S. at 289, 88 S.Ct. at 1592. Immaterial factual disputes should not block summary judgment. *SEC v. Research Automation Corp.*, 585 F.2d at 35. Finally, while plaintiff correctly complains that defendants have failed to submit the statement of material facts as to which the movants contend there is no genuine issue required by Local Rule 3(g), that failure is merely a technical omission in this case, since defendants' responses to plaintiff's pretrial order set forth the facts upon which they seek judgment.

### III. *Alleged Sherman Act § 1 Conspiracies*

Reborn maintains that various horizontal and vertical conspiracies whose object was to terminate it as a retail distributor of the MacLaren Baby Buggy existed among the defendants. Reborn alleges conspiracies to fix prices, to allocate markets, to boycott, and to establish tying arrangements, all allegedly violations of section 1 of the Sherman Act. 15 U.S.C. § 1.

■ Section 1 of the Sherman Act states: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is declared to be illegal." But while "the Sherman Act speaks of restraint of trade in absolute terms, it has long been established that § 1 proscribes only unreasonable restraints. *Standard Oil Co. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911)." *Borger v. Yamaha International Corp.*, 625 F.2d 390, 396 (2d Cir. 1980). Courts apply a *per se* rule only to "agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). The legality of all other arrangements is governed by a rule of reason, "which invites a more open inquiry into, and a balancing of, such factors as the power of the defendant(s), the effect of the arrangement, its possible redeeming virtues, and the availability of alternative ways of achieving any legitimate objectives with fewer threats to competition." II Areeda & Turner, ¶ 314 at 49.

■ The starting point for proof of a section 1 violation is evidence of a contract, combination, or conspiracy between two or more persons. "Proof of joint or concerted action is required; proof of unilateral action does not suffice." *Schwimmer v. Sony Corp. of America*, 677 F.2d 946, 952 (2d Cir.1982). For example, a unilateral decision by any defendant not to deal with Reborn for any reason would not amount to a violation of section 1 of the Sherman Act. *See Monsanto Co. v. Spray-Rite Service Corp.*, —— U.S. ——, ——, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775, 783 (1984); *Oreck Corp. v. Whirlpool Corp.*, 639 F.2d 75, 78–79 (2d Cir.1980), *cert. denied*, 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 618 (1981).

■ Conspiracies are, of course, rarely evidenced by explicit agreements, but must usually be proved by "inferences that may fairly be drawn from the behavior of the

alleged conspirators." *Michelman v. Clark-Schwebel Fiber Glass Corp.*, 534 F.2d 1036, 1043 (2d Cir.), *cert. denied*, 429 U.S. 885, 97 S.Ct. 236, 50 L.Ed.2d 166 (1976). At a minimum, however, "the circumstances [must be] such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *American Tobacco Co. v. United States*, 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946).

A. *Alleged Intraenterprise Conspiracy*

Plaintiff contends that MacLaren Ltd. and MacLaren Inc. schemed to terminate his store as a distributor of the MacLaren Baby Buggy by combining to fix prices, boycott, and allocate markets. The initial question is whether section one proscribes the conspiracy alleged between the parent corporation, MacLaren Ltd., and its wholly owned subsidiary, MacLaren Inc.

█ In *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.*, 340 U.S. 211, 215, 71 S.Ct. 259, 261, 95 L.Ed. 219 (1951), the Supreme Court held that "common ownership and control does not liberate corporations from the impact of the antitrust laws." However, "[a] single corporate entity of all its agents and employees are normally treated as a single actor for antitrust purposes except where the individuals or subentities are held out as competitors." R. Givens, *Antitrust: An Economic Approach* § 16.03, at 16–11 (1983); *see Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co.*, 370 U.S. 19, 28–29, 82 S.Ct. 1130, 1135, 8 L.Ed.2d 305 (1962); *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71, 80–84 (9th Cir.1969) (divisions of same corporation cannot conspire), *cert. denied*, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970). *See generally* Willis & Pitofsky, *Antitrust Consequence of Using Corporate Subsidiaries*, 43 N.Y.U.L.Rev. 20 (1968).

█ The uncontradicted evidence here demonstrates that MacLaren Inc. and Ma-

cLaren Ltd. neither hold themselves out as competitors nor actually compete. MacLaren Inc. was formed solely to act as distributing agent for MacLaren Ltd. in America, as Hambleton, Kurzman, Myles, Jones, and Cross testified. The personnel of the two organizations are closely interrelated. James Myles serves as Chairman of the Board of Directors of both MacLaren Ltd. and MacLaren Inc.; George Hambleton is a member of both Boards and is President of MacLaren Inc.; Maxwell Cross, formerly Marketing Manager of MacLaren Ltd., is presently Vice President of MacLaren Inc. The subsidiary makes no major policy decisions without MacLaren Ltd.'s approval, as evidenced by their communications about whether to deal with plaintiff and their joint decision about which company would become the new distributor. MacLaren Ltd. set the suggested retail price, which MacLaren Inc. automatically adopted. The two corporations do not compete; rather, their relationship is one of cooperation and integration. *See Brager & Co. v. Leumi Securities Corp.*, 429 F.Supp. 1341, 1345 (S.D.N.Y.1977) (Weinfeld, J.), *aff'd mem.*, 646 F.2d 559 (2d Cir.1980), *cert. denied*, 451 U.S. 987, 101 S.Ct. 2322, 68 L.Ed.2d 845 (1981); *I. Haas Trucking Corp. v. New York Fruit Auction Corp.*, 364 F.Supp. 868, 873–74 (S.D.N.Y.1973); *Beckman v. Walter Kidde & Co.*, 316 F.Supp. 1321, 1325–27 (E.D.N.Y.1970), *aff'd per curiam*, 451 F.2d 593 (2d Cir.1971), *cert. denied*, 408 U.S. 922, 92 S.Ct. 2488, 33 L.Ed.2d 333 (1971). Moreover, MacLaren Inc. was created from its parent, which wholly owns it. *See Brager & Co.*, 429 F.Supp. at 1345; R. Givens, § 16.03, at 16–11 to –12 (discussing U.S. Department of Justice, Antitrust Division, *Antitrust Guide for International Operations*, Case A, at 11–14 (1977)). Here "the economic realities of their relationship" preclude finding MacLaren Ltd. and MacLaren Inc. distinct economic entities for purposes of the Sherman Act. *Fuchs Sugars & Syrups, Inc. v. Amstar Corp.*, 602 F.2d 1025, 1031 n. 5 (2d Cir.1979), *cert. denied*, 444

U.S. 917, 100 S.Ct. 232, 62 L.Ed.2d 172 (1980).

A manufacturer electing to market its goods through a distributor is using the latter to supply its goods to consumers more efficiently than the manufacturer could itself. In *General Electric Co. v. Bucyrus-Erie Corp.*, 563 F.Supp. 970, 976 (S.D.N.Y.1983), the court noted that "if no other interpretation of the facts is possible except that a controlled subsidiary, with whom a parent was alleged to have conspired, was created to be and never acted other than as agent for the parent,.... no valid conspiracy claim is stated because separate entities do not exist to conspire." The record contains no evidence that MacLaren Ltd. and MacLaren Inc. ever operated other than as a unit. Thus neither the evidence that the personnel of MacLaren Ltd. and MacLaren Inc. conferred about Reborn's discounting policy, the complaints they had received about it, and the close proximity of Reborn to Ben's, nor the evidence that the organizations were unhappy with the situation and discussed ways to deal with it, establish a claim warranting trial of a conspiracy between the companies to engage in the alleged unlawful behavior.

### B. *Price-Fixing Allegations.*

Plaintiff maintains that MacLaren Ltd. and MacLaren Inc., (hereinafter referred to jointly as "MacLaren") and Fine and Fine Child (hereinafter referred to jointly as "Fine Child") conspired vertically with various retailers selling the stroller, including Wein and Ben's (hereinafter referred to jointly as "Ben's"), and that the various retailers conspired horizontally to maintain the resale price of the MacLaren stroller. Price-fixing conspiracies are unlawful *per se*. *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 218, 60 S.Ct. 811, 842, 84 L.Ed. 1129 (1940).

1. *Vertical Price-Fixing Conspiracy.* To establish its conspiracy claim, plaintiff first points to the close business and personal relationships among the defendants Wein, Fine, and MacLaren, including the frequent meetings and correspondence among them. The Second Circuit has laid down "fairly specific guidelines" in evaluating the probative value of such evidence to support an inference of conspiracy:

> "A mere showing of close relations or frequent meetings between the alleged conspirators ... will not sustain a plaintiff's burden absent evidence which would permit the inference that these close ties led to an illegal agreement." Nor does a manufacturer's mere receipt of complaints from its wholesalers or agents who compete with the plaintiff, or its consultation with such other competing wholesalers, standing alone, support a finding of conspiracy with them. Even where a termination follows the receipt of complaints from wholesalers or agents, there is no basis for inferring the existence of concerted action, absent some other evidence of a tacit understanding or agreement with them. Finally, the mere fact that a business reason advanced by a defendant for its cut-off of a customer is undermined does not, by itself, justify the inference that the conduct was therefore the result of a conspiracy. Even if a manufacturer or supplier, acting independently, gave a false or inaccurate reason for its action, whether because of a desire to avoid controversy or some other consideration, this would not violate any legal obligation to the customer, absent proof of a conspiracy or breach of contract.

*H.L. Moore Drug Exchange v. Eli Lilly & Co.*, 662 F.2d 935, 941 (2d Cir.1981) (citations omitted), *cert. denied*, 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144 (1982).

Reborn accords particular significance to the receipt by MacLaren of complaints from Reborn's competitors and to the subsequent termination by Fine Child of the Reborn account. Unquestionably, various retailers selling the stroller complained to MacLaren about Reborn's predatory pricing. But as the Second Circuit has repeatedly held, *see, e.g., id.*, and the Supreme Court recently confirmed, *see Monsanto*, —— U.S. at —— & n. 8, 104 S.Ct. at 1471 & n. 8, 79 L.Ed.2d at 785 & n.

8, evidence of complaints, even when followed by termination, cannot alone establish the requisite inference; "something more" is needed. *Id.* at ——, 104 S.Ct. at 1470, 79 L.Ed.2d at 785. The *Monsanto* Court found this additional quantum of probative evidence in the testimony of a district manager that the company advised price-cutting distributors on at least two occasions that if they did not maintain the suggested retail price they would not receive adequate supplies of a new product and in evidence of coerced compliance by at least one former price-cutter. *Id.* This type of evidence is lacking in the present case. As Justice Powell noted in *Monsanto,* "[p]ermitting an agreement to be inferred merely from the existence of complaints, or even from the fact that termination came about 'in response to' complaints, could deter or penalize perfectly legitimate conduct." *Id.* Moreover, retailers are an important source of information for manufacturers and their agents, which the antitrust laws should not operate to foreclose. *Monsanto,* at ——, 104 S.Ct. at 1470, 79 L.Ed.2d at 785. "In sum, '[t]o permit the inference of concerted action on the basis of receiving complaints alone and thus to expose the defendant to treble damage liability would both inhibit management's exercise of independent business judgment and emasculate the terms of the statute.'" *Id.* (quoting *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.,* 637 F.2d 105, 111 n. 2 (3d Cir.1980), *cert. denied,* 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981).

Reborn claims that unity of purpose among defendants is also apparent from the fact that MacLaren Ltd. published and MacLaren Inc. distributed a suggested retail price list and urged the retailers to adhere to these prices. Publication of a suggested retail price list, however, and voluntary adherence to it by plaintiff's competitors, is insufficient to support a finding of a vertical price fixing conspiracy. *Fuchs Sugars & Syrups,* 602 F.2d at 1030. A manufacturer or dealer may announce the terms under which he will market his product and deal only with those customers who agree to abide by those terms. *Mon-*

*santo,* —— U.S. at ——, 104 S.Ct. at 1469–70, 79 L.Ed.2d at 783–84 (citing *United States v. Colgate Co.,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919)). On the other hand, a manufacturer or its agent may not "enforce his announced resale prices by active coercion of those who purchase for resale, such as through threats of termination for noncompliance, whether made in combination with others or alone." *Bowen v. New York News, Inc.,* 522 F.2d 1242, 1254 (2d Cir.1975) (citations omitted), *cert. denied,* 425 U.S. 936, 96 S.Ct. 1667, 48 L.Ed.2d 177 (1976). For Reborn to avoid summary judgment on its price-fixing claim it must advance sufficient evidence to raise a genuine dispute as to whether defendants engaged in coercive activity to force adherence to its suggested retail price and plaintiff and other retailers actually adhered to that price. *See Albrecht v. Herald Co.,* 390 U.S. 145, 149–50, 88 S.Ct. 869, 871–72, 19 L.Ed.2d 998 (1968); *United States v. Parke, Davis & Co.,* 362 U.S. 29, 43, 80 S.Ct. 503, 511, 4 L.Ed.2d 505 (1960). "While evidence of exposition, persuasion, argument, or pressure is alone insufficient to establish coercion, threats of termination, so long as they secure adherence to the fixed price, have been deemed to trespass beyond the boundaries of *Colgate,* thereby triggering a finding of an illegal combination." *Yentsch v. Texaco, Inc.,* 630 F.2d 46, 53 (2d Cir.1980) (citations omitted); *see id.* at 51–55.

Plaintiff has failed to raise a genuine dispute as to whether anyone adhered to the suggested price. The depositions of the various store owners reveal that several, including Ben's, Albee's, and Schneider's, sold above the suggested retail price, while at least two, Hatzlacha and Darlings, sold below it. These companies represented approximately half of the MacLaren accounts in New York. Leffler 15; Kurzman 66, 68; Wein 18.

Furthermore, even had most of the MacLaren accounts adhered to the suggested retail price, no significant evidence has been advanced of coercive action on MacLaren's part. Of course, "active coercion"

can take many forms. In *Interphoto Corp. v. Minolta Corp.*, 295 F.Supp. 711, 716, 718–19 (S.D.N.Y.), *aff'd*, 417 F.2d 621 (2d Cir.1969), the court found the use of an elaborate surveillance system and threats of "drastic" action enough to establish an illegal coercive atmosphere. The *Yentsch* court "just barely" found sufficient evidence to establish the existence of an illegal combination to maintain resale prices on the basis of written and oral evidence that the manufacturer had instructed his agents to tell the dealers that if volume did not increase they were to be terminated, as well as testimony by the plaintiff that he was told to drop the price or risk replacement. 630 F.2d at 52–53.

Here, by contrast, Reborn has failed to adduce the minimum amount of evidence which would permit a reasonable jury to find a vertical price-fixing scheme. Kurzman stated that she once received many complaints about a price cutter and asked him to try to stay within a few dollars of the suggested price, because MacLaren was trying to market a new product in America. Kurzman 65. When the owner continued to discount, no one at MacLaren took additional action. The record does contain Wallis' deposition testimony that he was threatened by MacLaren to raise his prices or risk termination. Wallis 240. There is no other suggestion in the record that Kurzman threatened to terminate any account for discounting. Wallis' testimony, of course, relates only to Reborn, and is wholly undercut by the fact that MacLaren continued to supply Wallis' store for well over a year until Fine Child took over despite full knowledge of Reborn's consistent discounting policy. The only inhouse memo relied on by plaintiff is a note from MacLaren Ltd. to MacLaren Inc. in June 1981 which states: "No solution to the Reborn situation." Pltf.Exh. 018. From this evidence one could reasonably infer that MacLaren was displeased with its decision to sell to Reborn, but had not come up with any way to deal with the problem; one could not reasonably infer from this evidence that MacLaren conspired to threaten plaintiff or to terminate him. Finally,

Kurzman concedes that at two or three different times she asked Wallis to stay near the suggested price, a policy she followed with all MacLaren accounts. But she and Hambleton firmly deny they ever threatened plaintiff. The evidence proffered by Reborn would demonstrate at most exposition, persuasion, argument, or pressure, which are alone insufficient to establish coercion. *See Yentsch*, 630 F.2d at 53.

■ 2. *Horizontal Price-Fixing Conspiracy.* Reborn insists that a horizontal conspiracy to fix prices existed between the various retailers. As noted above, neither complaints nor complaints plus termination constitute evidence of a conspiracy. Plaintiff relies on the fact that some stores which sold the stroller adhered to the suggested retail price. The leading case for the proposition that an agreement can be inferred from commonality of conduct is *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939). There the Court found an antitrust violation despite the absence of evidence that the various retailers had agreed among themselves to abide by the demands of the manufacturer. *Id.* at 225–27, 59 S.Ct. at 473–74. The Court found it "enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it." *Id.* at 226, 59 S.Ct. at 474. Later, however, the Court pointed out that it had "never held that proof of parallel business behavior conclusively establishes agreement" and cautioned that " 'conscious parallelism' ha[d] not yet read conspiracy out of the Sherman Act entirely." *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.*, 346 U.S. 537, 541, 74 S.Ct. 257, 259, 98 L.Ed. 273 (1954). The problem of consciously parallel conduct and interdependent decisionmaking has continued to challenge the courts and commentators. *See, e.g., First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 286–88, 88 S.Ct. 1575, 1591–92, 20 L.Ed.2d 569 (1968); *Ambook Enterprises v. Time, Inc.*, 612 F.2d

604, 613–18 (2d Cir.) (Friendly, J.), *cert. dismissed*, 448 U.S. 914, 101 S.Ct. 35, 65 L.Ed.2d 1179 (1980); *United States v. Phelps Dodge Industries, Inc.*, 589 F.Supp. 1340, 1354–1356 (S.D.N.Y.1984); L. Sullivan, *Handbook of the Law of Antitrust* § 122 (1977). But the law is at least clear that "proof of consciously parallel business behavior is circumstantial evidence from which an agreement, tacit or express, can be inferred but that such evidence, without more, is insufficient unless the circumstances under which it occurred make the inference of a rational, independent choice less attractive than that of concerted action." *Ambook*, 612 F.2d at 615 (quoting *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 446 (3d Cir.1977) (Seitz, C.J.), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978)).

In this case, the evidence of consciously parallel conduct is weak, as the record indicates that some retailers sold at various prices above and below the suggested level. In any case, independent business considerations justified the conduct of those who adhered: it was their practice to do so when a manufacturer gave a suggested retail price, or they felt the price was reasonable, or the strollers were selling well at the price so they had no desire to raise or lower it. Plaintiff claims that the retailers' discussions of Reborn among themselves provides additional proof of conspiracy. To support this contention plaintiff cites the testimony of Weintraub of Albee's and Wein. The testimony reveals that Weintraub called Wein and said, "I'm being undersold," to which Wein replied, "Me, too, but there is nothing we can do." Wein 89–93; Weintraub 55–58. Weintraub spoke to Wein, however, because their families had been friends for forty years, and in fact both Wein and Weintraub sold above the suggested price.

In sum, in this case the inference from the retailers' actions of a rational independent choice is far more compelling than that of concerted action, making summary judgment appropriate. *See Modern Home Institute*, 513 F.2d at 109–14. No probative evidence has been proffered by plaintiff that would permit a finding of a horizontal price-fixing scheme.

### C. Alleged Territorial Division of Markets.

Plaintiff alleges that MacLaren, Wein, and other retailers vertically conspired to restrict the territory in which Reborn could sell the stroller. Plaintiff claims that Kurzman's and Hambleton's request that he not sell from the Upper East Side store until they talked to Wein, and MacLaren's general unwillingness to sell to any store near Ben's, Pltf.Exh. 82, amounted to an unlawful, vertical territorial restriction, and that this restriction was enforced as part of a conspiracy to terminate Reborn. Plaintiff also alleges a horizontal conspiracy to restrict territories.

**1. Vertical Territorial Restriction.** While nonprice restrictions furthering a price-fixing scheme designed to keep a supplier's product out of the hands of a discounter are judged under *per se* analysis, vertical, concerted actions on nonprice restrictions are judged under the rule of reason and violate section 1 only if the action is anticompetitive in purpose or effect. *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 57–59, 97 S.Ct. 2549, 2561–2562, 53 L.Ed.2d 568 (1977); *Monsanto*, —— U.S. at —— n. 6, 104 S.Ct. at 1468 n. 6, 79 L.Ed.2d at 783 n. 6; *Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126, 131 (2d Cir.) (en banc), *cert. denied*, 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978). Because no price-fixing scheme could be proved in this case, the alleged territorial restrictions must be evaluated under the rule of reason.

In *Sylvania*, the defendant manufacturer restricted the store locations from which a retailer could sell his merchandise. The Supreme Court held that before condemning such a scheme it was necessary to examine whether justifiable business reasons existed to support it. One such reason is a manufacturer's desire to encour-

age and reward a particular dealer who provides exceptional service and repair, and thus enhances product reputation. Absent territorial allocations, dealers in a given area might be unwilling to provide appropriate levels of service for fear of "free riders." *Sylvania*, 433 U.S. at 55, 97 S.Ct. at 2560. If profit opportunities are denied dealers in a given territory, they might refuse to incur expenses necessary to permit the manufacturer to compete effectively against its interbrand rivals. The "free rider" problem is highly relevant in the present controversy. Reborn often was unable to repair the strollers it sold, and as a result consumers brought MacLaren strollers purchased at Reborn to Wein for repair. Wein provided excellent repair service and MacLaren sought to maintain its good relationship with Wein so he would continue to do so. MacLaren's request that Wallis not sell from the Upper East Side therefore was motivated by the legitimate business reason of continuing a strong business relationship with a favored account. Under *Sylvania*, the "restriction" sought by MacLaren was lawful.

 "[T]he agreement necessary to establish a section 1 violation ... may be found to exist in a territorial restraint case if the defendant, by his own coercive actions, has put together a system of territorial restraints to which his customers or distributors adhere." *Jacobson & Co. v. Armstrong Cork Co.*, 433 F.Supp. 1210, 1213 n. 17 (S.D.N.Y.) (Weinfeld, J.), *aff'd*, 548 F.2d 438 (2d Cir.1977). However, "[i]f the decision to terminate was solely based on legitimate business reasons such as ... [plaintiff's] excessive and unjustified complaints, and its deteriorating relationship with [defendant], then [plaintiff's] claim must be dismissed." *Id.* at 1214. Reborn claims its termination was influenced by improper motives, particularly MacLaren's desire to protect Wein against competition from plaintiff in the Upper East Side. To prove this it relies upon the assurances Wein was given by MacLaren personnel, before MacLaren sold to plaintiff, that no other store in the Upper East Side would get the stroller; on Hambleton and Kurzman's request that Wallis hold off selling the stroller from the Upper East Side until they could talk to Wein; on MacLaren's practice of referring requests for strollers from the United States to Ben's; and on memoranda reflecting MacLaren's reluctance to sell to any other store in the Upper East Side.

Approximately two weeks passed from the time MacLaren sent its first shipment to plaintiff until Reborn began to sell from its Upper East Side store. Wallis himself testified that Hambleton told him to go ahead and sell from there. Wallis 215. Defendants took no action against Wallis for his decision, but rather continued to deliver the strollers he ordered. Whatever MacLaren did to aid Ben's, or said to Wein, the fact is that no territorial restriction was implemented by MacLaren when Wallis went ahead and sold from the area of concern. This evidence could not establish any agreement between MacLaren and Ben's. *See Jacobson*, 433 F.Supp. at 1214.

The MacLaren defendants contend it was Fine's and not their decision to terminate Reborn. Even assuming, however, that MacLaren was somehow involved in the decision to terminate Reborn, that decision was based upon plaintiff's repeated and vituperative complaints to defendants and the bad relationship to which this led. After the misdelivery incident, followed by Wallis' threats of lawsuits, his taping of phone conversations, his refusal to repair strollers, Reborn's predatory pricing, and his tying up the phone lines at MacLaren Inc. to learn the identity of the new distributor, he and the various defendants had increasingly abrasive discussions. Wallis' behavior, however much he may have believed his position justifiable, itself provided the MacLaren defendants a legitimate business reason for their decision to terminate Reborn as a retail distributor of the stroller.

Fine or Fine Child likewise had legitimate business concerns that would justify a decision to refuse to sell strollers to Reborn. Fine appears to have been partic-

ularly concerned that Reborn was a maternity store. Furthermore, Wallis concedes that he attacked Fine on the phone and threatened to sue him, which gave Fine good reason to refuse to deal with such a customer. A businessman's churlish behavior should not be permitted to become an asset, enabling him to bootstrap himself onto an antitrust claim by having a reasonable businessman's refusal to deal with him be regarded as evidence of an illegal conspiracy.

■ Finally, MacLaren or Fine could legitimately try to give Wein exclusivity on the Upper East Side by expressing reluctance or even refusing to sell to other stores in that area. A manufacturer can establish a system of exclusive distributorships without violating section 1 of the Sherman Act:

> Such a voluntary choice presumptively establishes ... that the system is a more efficient method of distributing [the manufacturer's] product. Even if he is irrational or mistaken, the fact that he has created a monopoly or near monopoly for one or more distributors is not "monopolizing" conduct on his part, for it has no exclusionary effects on his actual or potential rivals.

Areeda & Turner, ¶ 734d, at 262.

■ *2. Horizontal Territorial Restriction.* A horizontal market allocation occurs when competitors on the same level agree only to sell within certain territories. In *United States v. Topco Associates, Inc.,* 405 U.S. 596, 608, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972), the Supreme Court reiterated that these types of arrangements are *per se* unlawful. Except for the lamentations of Weintraub and Wein, however, who on one occasion complained to each other that they were being undersold, the record contains not a shred of evidence that the retailers selling the MacLaren stroller ever had anything to do with one another. This is a frivolous claim.

### D. *Alleged Boycott.*

Reborn alleges a series of horizontal and vertical concerted refusals to deal which appear to exhaust the possible combinations of characters. Notwithstanding the Second Circuit's warning that in boycott cases "[i]t is important to distinguish between 'horizontal' ... and 'vertical' restraints," *Oreck Corp. v. Whirlpool Corp.,* 579 F.2d at 131, it is unnecessary here to parse each of the overlapping allegations. In effect, Reborn contends that MacLaren, Fine Child, and various retailers engaged in a complex conspiracy similar to that of the manufacturers, distributors, and retailer alleged in *Klor's, Inc. v. Broadway Hale Stores, Inc.,* 359 U.S. 207, 212–14, 79 S.Ct. 705, 709–10, 3 L.Ed.2d 741 (1959), to which the Supreme Court applied a *per se* analysis. *See* 359 U.S. at 212–14, 79 S.Ct. at 709–10; *Oreck Corp. v. Whirlpool Corp.,* 579 F.2d at 131. Reborn cannot avoid summary judgment on these contentions, however, because it has not raised a material issue of fact as to any of the enumerated conspiracies. Summary judgment is also compelled on the vertical conspiracies, which are examined under the rule of reason, for Reborn has failed to adduce evidence which would put at issue the business justifications for defendants' conduct.

■ As applied to MacLaren plaintiff's claim has no merit, because in fact MacLaren did not refuse to deal with Reborn, but took Reborn on as an account. MacLaren Inc. stopped doing business with Reborn in November 1981, when Fine Child became the new distributor, and at the time MacLaren Inc. stopped dealing with all its other accounts. MacLaren's present decision not to do business with Reborn because they are involved in litigation is a unilateral decision, protected under *Colgate.* Moreover, a desire to avoid burdensome litigation would constitute a legitimate business reason for refusing to deal. *See House of Materials, Inc. v. Simplicity Pattern Co.,* 298 F.2d 867, 871 (2d Cir. 1962); *Zoslaw v. MCA Distributing Corp.,* 693 F.2d 870, 889–90 (9th Cir.1982), *cert. denied,* 460 U.S. 1085, 103 S.Ct. 1777, 76 L.Ed.2d 349 (1983).

■ Reborn's horizontal boycott claim is similarly unsupported. In a conventional horizontal boycott, traders at one level seek to protect themselves from competition from others by taking concerted action aimed at depriving the excluded retailer from a trade relationship the retailer needs to compete effectively at that level. *See Klor's*, 359 U.S. at 212–14, 79 S.Ct. at 709–10. No evidence exists of concerted action among the various retailers to protect themselves from Reborn, and there is no indication that they took action to "induce" MacLaren or Fine to stop selling to Reborn. No reasonable jury could possibly infer that a horizontal boycott existed.

■ Plaintiff also alleges that MacLaren Ltd. conspired with Fine Child to change distributors solely to cut off Reborn, which would amount to a vertical concerted refusal to deal subject to the rule of reason. A manufacturer may unilaterally decide to terminate one distributor in favor of another for any reason. *United States v. Schwinn & Co.*, 388 U.S. 365, 376, 87 S.Ct. 1856, 1864, 18 L.Ed.2d 1249 (1967), *overruled on other grounds, Continental T.V. Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). This Circuit in *Bowen v. New York News, Inc.*, 522 F.2d at 1254 stated that "where a manufacturer simply decides on his own to substitute one dealer for another ... his decision to sell exclusively to a new dealer does not amount to an antitrust 'conspiracy' with the latter." If a manufacturer may cease dealing with one distributor in order to deal with another without implicating the antitrust laws, certainly MacLaren could legally choose to transfer its distribution functions from a subsidiary to a nonaffiliated company so long as it did not act pursuant to some otherwise unlawful plan.

■ In *Calculators Hawaii, Inc. v. Brandt, Inc.*, 724 F.2d 1332, 1337–38 (9th Cir.1983), the court reversed a district court judgment in favor of the plaintiff on a section 1 claim. Calculators had alleged a concerted refusal to deal between Brandt, a money-handling machine manufacturer from whom it had previously purchased spare parts, and Hallett, an independent contractor from whom pursuant to a new agreement Brandt instructed owners of its machines to seek maintenance and repair. Calculators contended that their refusal to sell it spare parts cut off its supply of these parts and severely damaged its repair business. The Ninth Circuit observed that the facts "that Brandt and Hallett refused to sell parts to Calculators and that Calculators thereby lost business ... are simply insufficient standing alone to prove anticompetitive purpose or effect," and held that even Brandt's attempts to keep independent servicemen from obtaining its parts in order to protect Hallett's business did not render the refusal to deal unlawful. *Id.* Likewise here, the decisions of MacLaren and Fine Child not to sell to Reborn cannot alone establish the anticompetitive purpose or effect necessary under a rule of reason analysis. Thus, the failure of Reborn to raise a triable issue of fact as to the existence of a conspiracy between Fine Child and MacLaren renders meritless its contention of vertical boycott.

Although a conspiracy can be proved by circumstantial evidence, the pretrial record is devoid of any kind of evidence that MacLaren changed its distribution system merely to terminate Reborn. Evidence exists that Hambleton, President of MacLaren Inc., was occupied with other matters, that MacLaren Ltd. wanted to expand in the United States stroller market, and that MacLaren Inc. lacked the facilities and personnel to accomplish that expansion. MacLaren Ltd. spent some time searching for a juvenile goods distributors with far-reaching connections in the juvenile goods market and eventually selected Fine Child. In the context of this unrebutted proof, and the fact that MacLaren could unilaterally have terminated Reborn at any time, speculation that this change in MacLaren's distribution system occurred as a result of defendants' desire to terminate Reborn raises no triable issue of fact.

■ On October 8, 1982, the Managing Director of MacLaren wrote to Fine and stated that, before a final agreement

was signed, he was curious as to Fine's position "vis-a-vis Reborn." Pltf.Exh. 153. Plaintiff relies on this as circumstantial evidence of a conspiracy between MacLaren Ltd. and Fine to boycott Reborn. But a manufacturer has a right to confer with its distributor on its marketing strategy. *Monsanto,* —— U.S. at ——, 104 S.Ct. at 1470, 79 L.Ed.2d at 785. MacLaren's unhappiness about doing business with Reborn was no secret. And the reasons for this unhappiness are uncontroverted: Reborn's close proximity to Ben's, its inability to repair the strollers it sold, and Wallis' rude behavior to MacLaren employees. Given these legitimate concerns, it was reasonable for MacLaren Ltd. to find out Fine's stance on the matter before the distributorship agreement became final. In this factual business context, the letter standing alone does not suffice to raise an issue of fact warranting trial on the claim of a vertical conspiracy between MacLaren Ltd. and Fine to boycott Reborn. No evidence exists that MacLaren made a boycott of Reborn a condition of its arrangement with Fine. The letter indicates only that MacLaren wanted to make Fine aware of and sensitive to the problems Reborn's deficiencies and conduct created. Moreover, the agreement itself tends to refute Reborn's view of the letter's significance, since MacLaren Ltd. retained the right to terminate dealings with any customer, and did not therefore need Fine's agreement in advance to terminate Reborn.

Reborn's allegation that MacLaren Inc. conspired with Fine Child to boycott Reborn is based on inferences drawn from the difficulties MacLaren Inc. had in its dealings with Reborn, and the fact that Kurzman and Hambleton told Fine about their experiences with Reborn. Reborn infers that MacLaren recommended that Fine terminate the account, and that thereafter he refused to sell to Reborn.

MacLaren Inc.'s statements and suggestions to Fine are legally insufficient to establish a conspiracy. The antitrust laws permit a terminated distributor to confer with the new one on each of its accounts. The transfer of relevant business information should not be inhibited for fear of spawning antitrust allegations. Section 4(m) of the distributorship agreement gave Fine the authority to decide with whom to deal should MacLaren Ltd. choose not to be involved. Neither the advice of MacLaren's employees nor the influence of past events made Fine's decision any "less unilateral" or "more conspiratorial."

▮▮▮▮▮▮ Even if Fine acting independently gave Wallis a false or inaccurate reason for his action, whether because of a desire to avoid controversy or any other reason, he did not violate any legal obligation to the retailer so long as he did not act pursuant to a conspiracy. *H.L. Moore Drug Exchange,* 662 F.2d at 941. Even had Fine had an anticompetitive purpose in mind he would not have violated the Act. Because the evidence is uncontroverted that Fine acted without soliciting the aid of any other entity, his motives are irrelevant. *See Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.,* 478 F.Supp. 243, 265 (E.D.Pa. 1979), *aff'd,* 637 F.2d 105 (3d Cir.1980), *cert. denied,* 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981); *see also House of Materials, Inc. v. Simplicity Patterns Co.,* 298 F.2d 867, 870–71 (2d Cir.1962). "To establish the illegality of [an] act under Section 1, it is not enough to prove [the defendants'] motivation was that of punishment for discounting or anything else, however reprehensible." *Carbon Steel Products Corp. v. Alan Wood Steel Co.,* 289 F.Supp. 584, 588 (S.D.N.Y.1968) (quoting *Dart Drug Corp. v. Parke, Davis & Co.,* 344 F.2d 173, 186 (D.C.Cir.1965); *see GAF Corp. v. Circle Floor Co.,* 329 F.Supp. 823, 828 (S.D.N.Y.1971), *aff'd,* 463 F.2d 752 (1972), *cert. dismissed,* 413 U.S. 901, 93 S.Ct. 3058, 37 L.Ed.2d 1045 (1973).

#### E. *Alleged Tying Arrangement.*

Reborn claims that Fine Child engaged in illegal tying arrangements and that these arrangements not only violated section 1 of the Sherman Act but also section 3 of the Clayton Act, 15 U.S.C. § 14, which provides:

> It shall be unlawful for any person engaged in commerce in the course of such commerce to ... make a sale or contract for sale of goods ... or fix a price charged therefor ... on the condition, agreement, or understanding that the ... purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies or other commodities of a competitor or competitors of the ... seller, where the effect of such ... sale or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

Plaintiff maintains that the tying claim must be sustained against all the other defendants as well because the actions of the Fine defendants were part of an overall scheme to terminate plaintiff, in which all joined. In its complaint, plaintiff specifically charged the MacLaren defendants with tying as well, but that claim has apparently been abandoned, as it is not discussed in Reborn's pretrial order and memoranda.

■ Tying is "an agreement by a party to sell one product but only on the condition that the buyer also purchase a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 5–6, 78 S.Ct. 514, 518–519, 2 L.Ed.2d 545 (1958). The seller's leverage in the tying product market enables it to "deny competitors free access to the market for the tied product." *Id.* at 6, 78 S.Ct. at 518. In the instant case, the MacLaren stroller is allegedly the tying product, and all other products sold by Fine Child are allegedly the tied ones. Tying is a *per se* violation of both section 1 of the Sherman Act and section 3 of the Clayton Act, so long as forcing is likely. *Jefferson Parish Hospital District No. 2 v. Hyde*, — U.S. —, —, 104 S.Ct. 1551, 1560, 80 L.Ed.2d 2, 15 (1984).

■ A section 1 tying violation has at least five elements: "first, a tying and a tied product; second, evidence of actual coercion by the seller that in fact forced the buyer to accept the tied product; third, sufficient economic power in the tying product market to coerce purchaser acceptance of the tied product; fourth, anticompetitive effects in the tied market; fifth, involvement of a 'not insubstantial' amount of interstate commerce in the tied product market." *Yentsch*, 630 F.2d at 56–57 & n. 15 (citations omitted). "The elements of a violation of section 3 are: (1) sales of goods for use, consumption, or resale within the United States; (2) sales conditioned on the purchaser's not dealing in the goods of a competitor; (3) a potential effect of substantial lessening of competition in the market for the tied product." *Reisner v. General Motors Corp.*, 511 F.Supp. 1167, 1176 (S.D.N.Y.1981), *aff'd*, 671 F.2d 91 (2d Cir.), *cert. denied*, 459 U.S. 858, 103 S.Ct. 130, 74 L.Ed.2d 112 (1982).

■ While the elements of a violation under the two statutes vary a bit, they aim at the same evil—decisions to purchase distorted by economic considerations outside the relevant market. *See Reisner*, 511 F.Supp. at 1177. "[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Parish Hospital*, — U.S. at —, 104 S.Ct. at 1558, 80 L.Ed.2d at 13; *see Northern Pacific Railway*, 356 U.S. at 6, 78 S.Ct. at 518. Because this element of forcing is so crucial, "[p]er se condemnation—condemnation without inquiry into actual market conditions—is only appropriate if the existence of forcing is probable.". *Jefferson Parish Hospital*, — U.S. at —, 104 S.Ct. at 1560, 80 L.Ed.2d at 15.

■ A plaintiff might demonstrate the requisite forcing in two ways. He might "establish that he has been required to purchase something which he does not want to take." *Capital Temporaries Inc. of Hartford v. Olsten Corp.*, 506 F.2d 658, 662 (2d Cir.1974). Or he might show an "unremitting policy of tie-in," which, "if

accompanied by sufficient market power," might substitute for actual coercion. *Hill v. A–T–O, Inc.*, 535 F.2d 1349, 1355 (2d Cir.1976); *see Reisner*, 511 F.Supp. at 1177 n. 21. Thus in the face of the consistent testimony that Fine Child did not practice tied sales, Reborn must identify evidence either of a persistent policy of tie-in or of actual coercion. In this case, however, only circumstantial evidence exists of a tie-in and no evidence has been presented that stores with whom Fine dealt were required to purchase other Fine Child products if they wished to order the MacLaren stroller.

Reborn relies on the two conversations between Fine and Wallis in which Fine asked Wallis whether Reborn carried any of Fine's other products, Wallis said no, and Fine told Wallis that he would forward a catalogue and price list to Reborn so Wallis would learn its goods and current prices. Two weeks later in a second conversation Wallis said he was only interested in purchasing the stroller, and Fine told Wallis he would not do business with him. Reborn also claims that Fine sold to Stork Time, a maternity shop in Boston, Massachusetts, only because it purchased some of Fine's other products. And plaintiff asserts that most of the retailers of juvenile goods with whom Fine dealt purchased other Fine goods when Fine took over the MacLaren distributorship.

This evidence, taken as a whole and viewed in a light most favorable to Reborn, fails to support a conclusion that Fine's buyers were victims of a tying arrangement. Reborn concedes that Wallis himself told the proprietor of Stork Time to order Fine Child products if he wanted the stroller, so Stork Time's owner asked the Fine Child independent agent with whom it was dealing for other Fine Child goods of his own volition. Pltf.Pretrial Memo at 23. In *Yentsch* a tying arrangement was found where sales representatives of defendant Texaco told leaseholders that "dealers who refused trading stamps 'wouldn't be there when lease time came around again.'" 630 F.2d at 57. Nothing similar to this was said by Fine or Fine's agent to Stork Time's owner in this case. The owner of

Stork Time asked for the "tied" product, other Fine goods, because he was told by Reborn that it was the only way for him to get the stroller. He concluded this, not because he personally knew of a Fine Child "unremitting policy of tie-in" and felt threatened by it, but because Wallis told him that Fine engaged in tying agreements. Stork Time's proprietor never even tried to purchase just the MacLaren stroller, so Wallis' allegation that Fine sold strollers to Stork Time only because it purchased Fine's other juvenile products is conclusory and has no basis in fact.

Fine testified in his deposition that a number of his customers buy only MacLaren strollers from him and may or may not have purchased Fine Child products from other wholesalers. Fine 229. Furthermore, even if many customers did buy other Fine Child juvenile goods, "[t]ying arrangements can only be condemned if they restrain competition on the merits by *forcing* purchases that would not otherwise be made." *Jefferson Parish Hospital*, —— U.S. at ——, 104 S.Ct. at 1566, 80 L.Ed.2d at 22 (emphasis added). The record does not indicate that any of Fine's accounts purchasing Fine's other juvenile goods in addition to the MacLaren stroller did not want those goods. In fact, some store owners testified at their deposition that buying Fine's other goods at the same time they purchased the stroller was convenient for them. Leffler 23; Waxman 73. Almost all of the proprietors of Fine's accounts were deposed, but not one spoke of being coerced, in any way, into buying Fine's other goods. Mr. Cziment of Yeedl's in Brooklyn stated that he purchased only the stroller and did not mention anything about being subjected to pressure from Fine to buy other products. Cziment 33.

Given the absence of direct evidence of tying or evidence that many buyers were forced to buy an unwanted tied product, plaintiff must show that it was coerced into purchasing something it did not want. *Capital Temporaries, Inc.*, 506 F.2d at 662. Nothing supports plaintiff's claim

that he was required to buy Fine Child products in order to get the MacLaren stroller. Fine's inquiry of Wallis whether he carried any Fine Child goods was at most a sales pitch. Fine did not even send plaintiff the catalogue he said he would send, and as early as October and through November, before Fine spoke to Wallis, Fine had expressed his intention not to sell to Reborn. When Wallis called Fine, threatened to sue, and said he wanted nothing but carriages, Fine had either decided against selling Wallis anything, or had found ample reason for refusing to deal with him further because of his abusive behavior.

Absent evidence of forcing, tying arrangements are not unlawful. Plaintiff here has produced no evidence that Fine Child used its economic leverage in the market for MacLaren strollers to force either plaintiff or any other prospective buyer to purchase other Fine Child juvenile goods. Thus, even though other elements necessary to establish a tie-in might have been met here, *see Yentsch*, 630 F.2d at 57, absent any evidence of coercion summary judgment must be granted for defendants on the tying claim.

### F. *Alleged Rule of Reason Violations.*

▉ "In order to prevail in the absence of *per se* liability," and in the face of defendants' evidentiary showing, Reborn must come forward with evidence by which a jury could reasonably conclude that defendants' actions "unreasonably restrained competition." *Jefferson Parish Hospital,* —— U.S. at ——, 104 S.Ct. at 1567, 80 L.Ed.2d at 23.

Under the rule of reason analysis, "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Continental T.V. Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 49 [97 S.Ct. 2549, 2557, 53 L.Ed.2d 568] (1977). Among the most important circumstances to be considered are those relating to the competitive characteristics of the rel-

evant market. "Proof that the defendant's activities had an impact upon competition in a relevant market is an absolutely essential element of the rule of reason case." *Kaplan v. Burroughs Corp.*, 611 F.2d 286, 291 (9th Cir.1979), *cert. denied*, 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116 (1980). *Hayden Publishing Co. v. Cox Broadcasting Corp.*, 730 F.2d 64, 69–70 (2d Cir.1984) (additional citations omitted), *rev'g* 566 F.Supp. 503 (E.D.N.Y.1983). Moreover, "[a] determination as to the boundaries of the relevant product market is essential in order to measure the anti-competitive effect, if any, of defendants' actions." *Id.* at 70 (quoting 566 F.Supp. at 511). Reborn has not alleged the relevant market in its complaint, nor has it produced any evidence in its papers to define this market. In *Hayden* the Second Circuit held that a trial court cannot grant summary judgment to defendants for section 1 Sherman Act claims reviewed under a rule of reason where a plaintiff fails to produce sufficient evidence of a relevant product market, so long as a genuine issue exists as to the definition of the market. *Id.* The present controversy is distinguishable. Whereas in *Hayden* both parties provided the court with numerous economic and statistical studies as to the relevant product market, *see* 566 F.Supp. at 507–08, thus generating a genuine issue of fact as to its nature, here neither party has provided the court with any evidence on this matter. Fine Child states that MacLaren strollers comprise less than 5% of the national stroller market and less than 25% of the metropolitan "high-end" stroller market, Memorandum at 5, but even it has offered no evidence to support this. Summary judgment must therefore be granted defendants on these section 1 claims. In *Rios v. Marshall*, 530 F.Supp. 351, 357 n. 4 (S.D.N.Y. 1981), the court dismissed a section 2 Sherman Act claim for failure to allege what proportion of any relevant market was controlled by the defendants, a necessary element of a section 2 claim. Similarly, plaintiff's failure here either to allege or adduce evidence on what proportion of any rele-

vant market was restrained, a necessary element under rule of reason analysis, compels this court to dismiss the "rule of reason" claims under section 1 of the Sherman Act and section 1 of the Clayton Act. *See also Reisner*, 511 F.Supp. at 1176 n. 19; *cf. Kaplan v. Burroughs*, 611 F.2d at 291 (failure to produce substantive evidence proving relevant market entitles defendant, in rule of reason case, to judgment n.o.v.).

### IV. *Claims Not Alleged in the Complaint.*

In its pretrial order and memorandum of law, plaintiff added two claims not included in its complaint of a year earlier—a claim under section 2 of the Sherman Act, 15 U.S.C. § 2, that defendants monopolized, attempted to monopolize, and conspired to monopolize commerce, and a claim under the Robinson-Patman Act, 15 U.S.C. 13, that defendants engaged in price discrimination. Reborn has not formally moved to amend its complaint to include these claims, but has stated its intention to move at the appropriate time to conform the pleadings to the proof pursuant to Rule 15(a) and (b) of the Federal Rules of Civil Procedure. Plaintiff Letter (Nov. 15, 1983). Defendants have not responded to these claims in their summary judgment papers or pretrial order and have noted their objection to entertaining these claims, for which they contend no factual basis exists in any event. Defendants' Letter (Nov. 15, 1983).

 Plaintiff notified the court and parties that it would seek to conform the pleadings to the proof when this case was scheduled for trial. That notice will therefore be treated as a motion to amend the complaint, a form of relief within the trial court's discretion. *Oreck Corp. v. Whirlpool Corp.*, 639 F.2d at 81; *Ricciuti v. Voltarc Tubes, Inc.*, 277 F.2d 809, 814 (2d Cir.1960). While such a motion should be freely granted when justice requires, *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962), there is no reason to allow the amendment sought in this case.

Lack of diligence is reason enough for this conclusion. *See Oreck Corp.*, 639 F.2d at 81; *Wheeler v. West India S.S. Co.*, 205 F.2d 354, 354 (2d Cir.1953) (per curiam); *Kirby v. P.R. Mallory & Co.*, 489 F.2d 904, 912 (7th Cir.1973), *cert. denied*, 417 U.S. 911, 94 S.Ct. 2610, 41 L.Ed.2d 215 (1974); *Graboi v. Smith*, 432 F.Supp. 572, 575–76 (S.D.N.Y.1977); *Weight Watchers of Quebec, Ltd. v. Weight Watchers International, Inc.*, 398 F.Supp. 1047, 1056 (E.D.N.Y. 1975); J. Moore & J. Lucas, 3 *Moore's Federal Practice* ¶ 15.08[4], at 15–91 to –94 & n. 9. Reborn has had the facts necessary to make the two new allegations proposed throughout this litigation, but has unduly delayed in asserting them.

Alternatively, the amendment is denied because it would add two more meritless causes of action. "Although courts usually exercise their discretion in favor of allowing motions under Rule 15, they may also deny such a motion when a party seeks to interpose a claim that lacks merit." *Johnson v. Partrederiet Brovigtank*, 202 F.Supp. 859, 867 (S.D.N.Y.1962) (Feinberg, J.) (citations omitted); *see Slavin v. Benson*, 493 F.Supp. 32, 33 (S.D.N.Y.1980). Plaintiff claims that certain documentary evidence establishes that Fine Child and Ben's violated section 2 of the Robinson-Patman Act, 15 U.S.C. § 13, by discriminating in the price it charged for the MacLaren stroller. Plaintiff has produced records showing that Fine Child gave Ben's "B" pricing, which is the price charged if over $2000 of MacLaren merchandise is purchased. Plaintiff Exh. 156(B). In addition, records indicate that Ben's received an additional 5–10% discount from the "B" prices. Plaintiff Exh. 156 E–1. Thus, plaintiff concludes, Fine Child's conduct was unlawful by virtue of the fact that it discriminated in price between different purchasers of the same goods sold in the same time period. Similarly, plaintiff contends that Ben's conduct violates Robinson-Patman, since it is unlawful to induce or receive a discrimination in price.

 Plaintiff has no standing to assert these claims. Plaintiff asserts that Fine

"gave Ben's the 'B' pricing which is approximately 5% less than the 'A' pricing it charged its *other customers*", and that Ben's received an additional discount from Fine Child "not offered to *any other purchasers of the MacLaren stroller.*" Pltf. Pretrial Memo. at 39–40 (emphasis added). Fine refused to do business with Reborn, however, and did not honor any of Wallis' stroller orders. Therefore, at the time of the alleged price discrimination, Reborn was not competing with Ben's for strollers from Fine Child.

 Section 4 of the Clayton Act, 15 U.S.C. § 15, confers standing to raise a claim under section 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13(a). *Schwimmer v. Sony Corp. of America*, 637 F.2d 41, 46 (2d Cir.1980). Notwithstanding the broad language, in order to have standing under section 4, "a plaintiff must allege a causative link to his injury which is 'direct' rather than 'incidental' or which indicates that his business or property was in the 'target area' of the defendant's illegal act." *Litton Systems, Inc. v. American Telephone & Telegraph Co.*, 700 F.2d 785, 821 (2d Cir.1983) *cert. denied*, — U.S. —, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984) (quoting *Billy Baxter, Inc. v. Coca-Cola Co.*, 431 F.2d 183, 187 (2d Cir.1970), *cert. denied*, 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1973). Plaintiff need not be an actual purchaser, *id.*, nor a specifically intended target of the anticompetitive conduct, *Schwimmer*, 637 F.2d at 47–48 & n. 15. Without expressly approving the "target area" test, the Supreme Court recently advised courts assessing plaintiffs' standing under section 4 to "look (1) to the physical and economic nexus between the alleged violation and the harm to the plaintiff, and (2), more particularly, to the relationship of the injury alleged with those forms of injury about which Congress was likely to have been concerned in making defendant's conduct unlawful and in providing a private remedy under § 4." *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 478, 102 S.Ct. 2540, 2548, 73 L.Ed.2d 149 (1982); *see id.* at 476–84, 102 S.Ct. at 2547–2551. This inquiry, like that posited by the "target

area" test, recognizes that some consequences may flow from anticompetitive conduct which are simply "too remote" to give rise to a right for damages, *id.* at 476, 102 S.Ct. at 2548 (quoting *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 728 n. 7, 97 S.Ct. 2061, 2066 n. 7, 52 L.Ed.2d 707 (1977) —that "despite the broad wording of § 4 there is a point beyond which the wrongdoer should not be held liable," *id.* at 477, 102 S.Ct. at 2548 (quoting *Illinois Brick*, 431 U.S. at 760, 97 S.Ct. at 2082 (Brennan, J., dissenting)).

In this case, however, Reborn was neither a direct purchaser nor a customer farther down the line of distribution from the alleged price discrimination. As its allegations make clear, Reborn attempts to complain of discriminatory pricing as between other customers of Fine Child at a time when it was not purchasing strollers from this distributor. The wrong of which it complains is this inability to purchase, which while potentially unlawful under other provisions does not fall within the purview of the Robinson-Patman Act. That Fine Child allegedly discriminated between other purchasers of its products does not authorize Reborn to cast its fundamentally different complaint in Robinson-Patman guise. *See L & L Oil Co. v. Murphy Oil Co.*, 674 F.2d 1113, 1120–21 (5th Cir.1982).

 Reborn's proposed section 2 claims are likewise meritless. "The offense of monopoly under section 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident," *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966), while "[t]he essential elements of attempted monopolization ... are (1) a 'dangerous probability' of success' in monopolizing a given product market and (2) a specific intent to 'destroy competition or build monopoly,'" *Nifty Foods Corp. v. Great Atlantic & Pacific*

*Tea Co.*, 614 F.2d 832, 841 (2d Cir.1980) (citing *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 626, 73 S.Ct. 872, 890, 97 L.Ed. 1277 (1953), and *Lorain Journal Co. v. United States*, 342 U.S. 143, 153, 72 S.Ct. 181, 186, 96 L.Ed. 162 (1951)). Thus, proof of the relevant product market is essential to both these causes of action. *Id.* at 840.

■ Reborn "bears the burden of proving the boundaries of the relevant market," *id.*, yet it has failed even to allege facts which might identify this market. Because the claims would thus be subject to dismissal, *see id.* at 840–41, discretion counsels that Reborn not be permitted to amend its complaint to add them, *see, e.g., Johnson v. Partrederiet Brovigtank*, 202 F.Supp. at 867. Moreover, in the face of substantial evidence in the record of interbrand competition and a multibrand market, Reborn has failed to identify any evidence from which a reasonable jury might find that the defendants achieved or attempted to achieve monopoly power in any relevant market. Thus, summary judgment would also be appropriate.

■ Finally, the elements of the offense of conspiracy to monopolize "are (1) proof of a concerted action deliberately entered into with the specific intent to achieve an unlawful monopoly, and (2) the commission of an overt act in furtherance of the conspiracy." *Paralegal Institute, Inc. v. American Bar Association*, 475 F.Supp. 1123, 1132 (E.D.N.Y.1979), *aff'd mem.*, 622 F.2d 575 (2d Cir.1980). In the case of defendants' testimony that they did not engage in any such anticompetitive behavior, Reborn has failed to raise a triable issue either as to the existence of a conspiracy or any putative participant's specific intent to monopolize. *See id.* at 1132–33. Since exhaustive discovery has already been had, it would be fruitless at this point to allow amendment to add a claim which would be subject to summary judgment because of the patent unsupportability of Reborn's claim.

## V. Conclusion.

■ Summary judgment is granted defendants MacLaren Inc., MacLaren Ltd., Fine, Fine Child, Ben's for Kids, and Wein on all plaintiff's federal claims. Summary judgment should be granted "if but only if the [district] court is satisfied that a properly instructed jury, giving full weight to plaintiff's evidence, drawing every reasonable inference in its favor, and subjecting defendants' evidence to a critical eye, could not rationally find that plaintiff was entitled to any relief." *Ambook Enterprises v. Time Inc.*, 612 F.2d 604, 611 (2d Cir.), *cert. dismissed*, 448 U.S. 914, 101 S.Ct. 35, 65 L.Ed.2d 1179 (1980). In the present controversy, no jury finding for the plaintiff would survive the scrutiny of the Second Circuit. *See Schwimmer*, 677 F.2d at 956; *H.L. Moore Drug Exchange*, 662 F.2d at 946; *Fuchs Sugars and Syrups*, 602 F.2d at 1033; *Hill v. A–T–O, Inc.*, 535 F.2d at 1356; *see also Oreck Corp. v. Whirlpool Corp.*, 639 F.2d at 81. While abstract legal analysis might give one or more of plaintiff's numerous legal claims superficial plausibility, any realistic view of the circumstances underlying this lawsuit should make clear its suitability for dismissal prior to trial. The record reveals that Wallis was an unrelentingly suspicious and difficult person to do business with. He admits to attempting to tape a phone conversation with Fine without telling Fine he was doing so. Wallis 13–14. He had his relatives surreptitiously order catalogues from Fine Child solely to find out whether Fine was discriminating against him. Wallis 262. His testimony includes exaggerated inconsistencies. For example, at one point in his deposition he states that "People from Ben's [came] in ranting and raving ... threatening customers." Wallis 360. Later on he corrects himself. "Only he (Wein) came in and *may* have knocked over some clothes and *may* have knocked over some chairs." Wallis 367 (emphasis added). Wallis said he kept and filed written notes of all his conversations with defendants. He repeatedly threatened to sue Fine and other defendants if they failed to sell to him. Fine 117, 142; Hambleton 103.

The record makes clear that Wallis is attempting to employ the antitrust laws as a weapon against a supplier who has ceased doing business with him in reasonable response to his uncontrolled conduct and shoddy practices. But the antitrust laws are not a shelter for intemperate business people; they provide no protection against the usual consequences of obstreperous behavior. Even were it assumed that the defendants treated Wallis harshly or unfairly, the antitrust laws "were never meant to be a panacea for all wrongs." *Sitkin Smelting & Refining Co. v. FMC Corp.*, 575 F.2d 440, 448 (3d Cir.), *cert. denied*, 439 U.S. 866, 99 S.Ct. 191, 58 L.Ed.2d 176 (1978) (quoting *Parmelee Transportation Co. v. Keeshin*, 292 F.2d 794, 804 (7th Cir.), *cert. denied*, 368 U.S. 944, 82 S.Ct. 376, 7 L.Ed.2d 340 (1961)). The record reveals a business dispute which has taken on nasty personal dimensions, but it contains virtually no factual support for Reborn's legal contentions. Wallis has attempted to transmute personal animosity into an antitrust suit. But no real antitrust interest is involved here: the strollers continue to be sold to discounters, and the manufacturer is lawfully protecting its longterm interest by favoring a dealer who knows, sells, and repairs its strollers well.

### VI. *Pendent Jurisdiction.*

■ Dismissal of plaintiff's federal law claims raises the question whether the state law antitrust and business tort claims should be dismissed without prejudice to their assertion in state court. *See Smith v. Weinstein*, 578 F.Supp. 1297, 1304–06 (S.D. N.Y.), *aff'd*, No. 84–7164 (2d Cir. May 29, 1984). Since diversity is lacking the court has no independent jurisdiction of the state law claims beyond its authority to consider them pendent to substantial federal claims. *See United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). In this case the court has established that the federal antitrust claims were not substantial, and "the flimsy nature of federal claims may call for dismissal of pendent state claims." *Kavit v. A.L. Stamm & Co.*, 491 F.2d 1176,

1179 (2d Cir.1974) (Friendly, J.). Furthermore, the federal antitrust claims here are being dismissed without the need for a trial. Justice Brennan observed in *Gibbs* that "[c]ertainly, if the federal claims are dismissed before trial ... the state claims should be dismissed as well." 383 U.S. at 727, 86 S.Ct. at 1139. The Second Circuit has recently stated, "unless a trial of the operative facts is necessary to resolve claims that the federal court must hear, the federal court has no jurisdiction to take any action with respect to a pendent state law claim." *McLearn v. Cowen & Co.*, 660 F.2d 845, 848 (2d Cir.1981); *see Reese Publishing Co. v. Hampton International Communications Inc.*, 620 F.2d 7, 12–13 (2d Cir.1980); *Federman v. Empire Fund and Marine Insurance Co.*, 597 F.2d 798, 809 (2d Cir.1979); *Sciss v. Metal Polishers Union Local 8A*, 562 F.Supp. 293, 295 (S.D. N.Y.1983). Judge Friendly has advised that "[i]f it appears that the federal claims ... could be disposed of on a motion for summary judgment, under Fed.R.Civ.P. 56, the court should refrain from exercising pendent jurisdiction absent exceptional circumstances." *Kavit*, 491 F.2d at 1180. Here, moreover, the federal and state claims will not entirely overlap, since some state legal issues differ markedly from those presented by the federal claims.

The present controversy presents no special circumstances which might warrant hearing the state law claims. No unfairness has been alleged as likely to result. Nothing before the court would indicate that Reborn will be unable to assert its state law claims in the New York courts. A proper exercise of discretion requires dismissal of plaintiff's state antitrust and business tort claims, as well as of the defamation counterclaim. *See Smith v. Weinstein*, 578 F.Supp. at 1306.

SO ORDERED.